IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

RADAR ONLINE LLC and JAMES ROBERTSON,

Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION,

Defendant.

Civil Action No. 1:17-cv-03956-PGG

## DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Acting Section Chief from May 26, 2020 to July 26, 2020; Assistant Section Chief of RIDS from June 2016 to May 25, 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide. Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to

1

September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA litigation for the U.S. Army. I am an attorney registered in the State of Ohio and the District of Columbia.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 244 FBI employees, supported by approximately 89 contractors, who staff a total of ten (10) FBI Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13,526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of Plaintiff James Robertson's FOIA request for records related to the FBI's investigation and prosecution of financier Jeffrey Edward Epstein. In response to Plaintiff's request, the FBI processed on a document-by-document basis a total of 11,571 pages of responsive records. Of these pages, the FBI released 181 pages in full, released 1,051 pages in part, and withheld 10,339 pages in full for the following reasons: the information in those pages was exempt from disclosure pursuant to one or more applicable FOIA

Exemption(s); the pages were found to be duplicative of other pages accounted for elsewhere in the FBI's production; and/or the pages are sealed pursuant to United States Court order and thus unavailable for release through the FOIA. In addition to the 11,571 processed pages, the FBI also categorically withheld additional records pursuant to Exemption 7(A). *See infra* FN 7.

(4)　　In accordance with *Vaughn v. Rosen*, 424 F.2d 820 (D.C. Cir. 1973), this declaration is being submitted in support of Defendant's motion for summary judgment, and provides the Court with a summary of the administrative history of Plaintiff's request; the procedures used to search for, review, and process responsive records; the FBI's justification for withholding information in part or in full pursuant to FOIA Exemptions 3, 5, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552(b)(3), (b)(5), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), and (b)(7)(E); and the FBI's procedures for reviewing records that were categorically exempt pursuant to Exemption (7)(A).

### BACKGROUND INFORMATION CONCERNING JEFFREY EDWARD EPSTEIN

(5)　　In June 2008, Jeffrey Epstein pled guilty to a criminal charge of procuring prostitution of a minor. Epstein served 13 months of his 18-month sentence. On July 2, 2019, Jeffrey Epstein was indicted by a federal grand jury in the United States District Court for the Southern District of New York on one count of conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 371, and one count of sex trafficking, in violation of 18 U.S.C. §§ 1591(a), (b)(2), and 2. *United States v. Epstein*, No. 19 Cr. 490 (RMB) (S.D.N.Y.), Dkt. No. 2. Based on the indictment, Epstein was arrested by federal authorities. Epstein later died on August 10, 2019, at the Metropolitan Correctional Center, in New York, while the federal charges were pending. *United States v. Epstein*, No. 19 Cr. 490 (RMB) (S.D.N.Y.), Dkt. No. 52.

**ADMINISTRATIVE HISTORY OF PLAINTIFFS' REQUEST**

(6)     By electronic FOIA ("eFOIA")[1] dated April 20, 2017, Plaintiff Robertson submitted a FOIPA request to the FBI seeking "all documents relating to the FBI's investigation and prosecution of financier Jeffrey Edward Epstein . . ." Additionally, he requested a fee waiver and expedited processing. **(Ex. A.)**

(7)     By letter dated April 28, 2017, the FBI acknowledged receipt of Plaintiff's FOIA request, and notified Plaintiff it had assigned his request FBI FOIPA Request Number 1372398-000. The FBI informed Plaintiff that, because he requested information on one or more third party individuals, the FBI would neither confirm nor deny the existence of such records pursuant to FOIA Exemptions 6 and 7(C), 5 U.S.C. § 552(b)(6) and (b)(7)(C). The FBI's response explained that the mere acknowledgement of the existence of FBI records on third party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy. Additionally, the FBI advised it was closing Plaintiffs' request. The FBI instructed Plaintiff to visit www.fbi.gov, select "Services," "Information Management," and "Freedom of Information/Privacy Act" for more information about making requests for records on third party individuals (living or deceased). Finally, the FBI informed Plaintiffs they could appeal the FBI's response to the DOJ, Office of Information Policy ("OIP") within ninety (90) days of its letter, contact the FBI's public liaison, and or seek dispute resolution services by contacting the Office of Government Information Services ("OGIS"). **(Ex. B.)**

(8)     On August 28, 2017, Plaintiffs, through counsel, filed their First Amended

---

[1] An eFOIA is an electronic means by which requesters can submit FOIA requests to the FBI, online, through the FBI's public website, www.FBI.gov.

Complaint with the United States District Court for the Southern District of New York.[2] (ECF No. 12.)

(9)     By letter dated October 11, 2017, the FBI released responsive records to Plaintiffs. The FBI advised that it had reviewed 296 pages of records, released 38 pages of records in full or part and withheld the remaining pages in full. Information was withheld pursuant to FOIA Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E). **(Ex. C.)**

(10)     By letter dated November 1, 2017, the FBI released additional responsive records to Plaintiffs. The FBI advised it reviewed 527 pages of records and released 25 pages of records in full or part, with information withheld pursuant to FOIA Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E). **(Ex. D.)**

(11)     By letter dated December 1, 2017, the FBI released additional responsive records to Plaintiffs. The FBI advised it reviewed 562 pages of records and released 94 pages of records in full or part, with information withheld pursuant to FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E). **(Ex. E.)**

(12)     By letter dated January 2, 2018, the FBI released additional responsive records to Plaintiffs. The FBI advised it reviewed 556 pages of records and released 38 pages of records in full or part, with information withheld pursuant to FOIA Exemptions 3, 6, 7(C), and 7(D). **(Ex. F.)**

(13)     By letter dated February 1, 2018, the FBI advised it had withheld an additional 525 pages in full pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E). **(Ex. G.)**

(14)     By letter dated March 1, 2018, the FBI advised that it had reviewed 527 pages of

---

[2] Plaintiff Radar Online had filed a Complaint on May 25, 2017. After the FBI pointed out that Radar Online was not a proper Plaintiff in this case, Plaintiff James Robertson was added as a Plaintiff in the First Amended Complaint.

records and released eight (8) pages of records in full or part, with information withheld pursuant to FOIA Exemptions 3, 5, 6, 7(C), 7(D), and 7(E).  **(Ex. H.)**

(15)    By letter dated March 30, 2018, the FBI advised that it had withheld 520 pages in full pursuant to FOIA Exemptions 3, 6, 7(C), and 7(D).  **(Ex. I.)**

(16)    By letter dated May 1, 2018, the FBI advised that it withheld an additional 567 pages in full pursuant to FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E).  **(Ex. J.)**

(17)    By letter dated June 1, 2018, the FBI advised that it withheld 574 pages of records in full pursuant to FOIA Exemptions 3, 6, 7(C), and 7(D).  **(Ex. K.)**

(18)    By letter dated July 2, 2018, the FBI advised that it withheld 547 pages of records in full pursuant to FOIA Exemptions 3, 6, 7(C), and 7(D).  **(Ex. L.)**

(19)    By letter dated August 1, 2018, the FBI advised it withheld 526 pages of records in full pursuant to FOIA Exemptions 3, 6, 7(C), and 7(D).  **(Ex. M.)**

(20)    By letter dated August 31, 2018, the FBI released responsive records to Plaintiffs. The FBI released 160 pages of records in full or part and withheld 348 pages in full.  Information was withheld pursuant to FOIA Exemptions 3, 5, 6, 7(C), 7(D), and 7(E).  **(Ex. N.)**

(21)    By letter dated September 28, 2018, the FBI advised it had withheld 532 pages of records in full pursuant to FOIA Exemptions 3, 6, 7(C), and 7(D).  **(Ex. O.)**

(22)    By letter dated October 31, 2018, the FBI released responsive records to Plaintiffs.  The FBI advised it reviewed 500 pages of records and released 174 pages of records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E).  **(Ex. P.)**

(23)    By letter dated November 30, 2018, the FBI released responsive records to Plaintiffs.  The FBI advised it reviewed 518 pages of records and released seven (7) pages of

records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, and 7(C).  **(Ex. Q.)**

(24)   By letter dated December 28, 2018, the FBI released responsive records to Plaintiffs.  The FBI advised it reviewed 519 pages of records and released four (4) pages of records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, and 7(C).  **(Ex. R.)**

(25)   By letter dated March 1, 2019[3], the FBI released responsive records to Plaintiffs. The FBI advised it reviewed 574 pages of records and released 209 pages of records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E).  **(Ex. S.)**

(26)   By letter dated April 1, 2019, the FBI released responsive records to Plaintiffs. The FBI advised it reviewed 515 pages of records and released 232 pages of records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E).  **(Ex. T.)**

(27)   By letter dated May 1, 2019, the FBI released responsive records to Plaintiffs. The FBI advised it reviewed 540 pages of records and released 65 pages of records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E). **(Ex. U.)**

(28)   By letter dated May 31, 2019, the FBI released responsive records to Plaintiffs. The FBI advised it reviewed 519 pages of records and released 12 pages of records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E).

---

[3] No production occurred in January through March 2019, because of the lapse in appropriations funding for the Department of Justice.

**(Ex. V.)**

(29)    By letter dated June 28, 2019, the FBI released responsive records to Plaintiffs. The FBI advised it reviewed 527 pages of records and released 107 pages of records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, 7(C), 7(D), and 7(E). **(Ex. W.)**

(30)    In a series of letters sent between August 1, 2019, and December 31, 2019, the FBI informed Plaintiffs the material they requested was located in an investigative file exempt from disclosure pursuant to 5 U.S.C. § 552(b)(7)(A).[4] The FBI categorically reviewed[5] the remaining responsive documents and cited all applicable underlying exemptions. The FBI withheld in full all remaining responsive records pursuant to FOIA Exemption 7(A). Information in those records was also withheld pursuant to FOIA Exemptions 3, 5, 6, 7(B), 7(C), 7(D), and 7(E).[6] **(Exs. X, Y, Z, AA, BB, CC.)**

---

[4] Jeffrey Epstein was arrested on July 6, 2019, on federal charges for the sex trafficking of minors. RIDS reached out to an Assistant United States Attorney in SDNY, who confirmed that additional release of responsive material could negatively impact the pending prosecution. With this new development—a re-opened investigation—the further release of any responsive records was now reasonably anticipated to cause harm to the ongoing enforcement proceedings; thus, Exemption 7(A) became a properly asserted exemption claim over all previously protected information.

[5] During a categorical review, the FBI reviews each document and determines if the release of the documents would interfere with ongoing law enforcement proceedings. If processing a document for release could interfere with any law enforcement proceeding, the FOIA analyst will assert Exemption 7(A) and all underlying exemptions. This review process is explained in detail in ¶¶ 58-68 *infra*.

[6] The FBI began processing documents in response to Plaintiffs' request long before Mr. Epstein was arrested in 2019. When Mr. Epstein's arrest and the ongoing investigation became public in July 2019, the FBI began to assert Exemption 7(B) given that (1) a trial or adjudication was pending or truly imminent and (2) it was more probable than not that disclosure of the records would seriously interfere with the fairness of those proceedings. Mr. Epstein's death on August 10, 2019, arguably negated the application of Exemption 7(B). However, the records withheld pursuant to Exemption 7(B) were additionally withheld pursuant to Exemptions 3, 6, 7(A), 7(C), and 7(D), and remain properly withheld despite Mr. Epstein's death.

(31)     By letter dated January 31, 2020, the FBI released additional responsive records to Plaintiffs.  In particular, the FBI released 46 pages of records in full or part, with certain information withheld pursuant to FOIA Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E).  **(Ex. DD.)**

## THE FBI'S CENTRAL RECORDS SYSTEM

(32)     The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions.  The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(33)     The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories.  The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters.  For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components:  (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[7]  Within each case file, pertinent documents of interest are "serialized," or assigned a document number in the order which the

---

[7] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case specific file number.

document is added to the file, typically in chronological order.

## THE CRS GENERAL INDICES AND INDEXING

(34)     The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS.  The CRS is indexed in a manner which meets the FBI's investigative needs and priorities and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties.  The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval.  The entries in the general indices fall into two category types:

> A.  Main entry.  A main index entry is a created for each individual or non-individual that is the subject or focus of an investigation.  The main subject(s) are identified in the case title of most documents in a file.
>
> B.  Reference entry.  A reference index entry is created for individuals or non-individuals associated with the case but are not the main subject(s) or focus of an investigation.  Reference subjects are typically not identified in the case title of a file.

(35)     FBI employees may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery).  Indexing information in the CRS is done at the discretion of FBI investigators when information is deemed of sufficient significance to warrant indexing for future retrieval.  Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

## AUTOMATED CASE SUPPORT

(36)     Automated Case Support ("ACS") was an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1,

1995. As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. ACS had an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[8]

(37)    The Universal Index ("UNI") was the automated index of the CRS and provided all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching. Individual names were recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event. Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompassed data that was already indexed into the prior automated systems superseded by ACS. As such, a UNI index search in ACS was capable of locating FBI records created before its 1995 FBI-wide implementation in both paper and electronic format.[9]

### ACS AND SENTINEL

(38)    Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012. Sentinel provides a web-based interface to FBI users, and it includes the same automated applications that were utilized in ACS. After July 1, 2012, all FBI

---

[8] ACS was, and the next generation Sentinel system is, relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

[9] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices."

generated records are created electronically in case files via Sentinel; however, Sentinel did not

replace ACS and its relevance as an important FBI search mechanism. Just as pertinent

information was indexed into UNI for records generated in ACS before July 1, 2012, when a

record is generated in Sentinel, information is indexed for future retrieval.

(39)     On August 1, 2018, the ACS case management system was decommissioned and

ACS data was migrated into Sentinel including the ACS indices data and digitized investigative

records formerly available in ACS. Moreover, Sentinel retains the index search methodology

and function whereby the CRS is queried via Sentinel for pertinent indexed main or reference

entries in case files. All CRS index data from the UNI application previously searched via ACS

is now searched through the "ACS Search" function within Sentinel.

(40)     Upon receipt of FOIPA requests where the subject matter predates the

implementation of Sentinel, RIDS predominately begins its FOIPA searching efforts by

conducting index searches via the "ACS Search" function in Sentinel. RIDS then builds on its

ACS index search by conducting an index search of Sentinel records to ensure it captures all

relevant data indexed after the implementation of Sentinel. The CRS automated indices,

available within Sentinel and the ACS search function in Sentinel, in most cases represent the

most reasonable means for the FBI to locate records potentially responsive to FOIPA requests.

This is because these automated indices offer access to a comprehensive, agency-wide set of

indexed data on a wide variety of investigative and administrative subjects. Currently, these

automated indices consist of millions of searchable records and are updated daily with material

newly indexed in Sentinel.

(41)     However, the location of records indexed to the subject of a FOIPA request does

not automatically mean the indexed records are responsive to the subject. Index searches are the

means by which potentially responsive records are located, but ultimately, a FOIPA analyst must

consider potentially responsive indexed records against the specific parameters of individual

requests. Responsiveness determinations are made once indexed records are gathered, analyzed,

and sorted by FOIPA analysts, who then review the records to determine which are responsive to

an individual request.

## ADEQUACY OF SEARCH

(42)   <u>Scope of Search and Results.</u>   RIDS conducted a search reasonably calculated to

locate records responsive to Plaintiffs' request, specifically "documents relating to FBI's

investigation and prosecution of financier Jeffrey Edward Epstein . . .." Prior to conducting a

search of the CRS, and particularly in matters of heightened public interest, RIDS typically

conducts a preliminary search of the FOIA Document Processing System ("FDPS") to determine

if a subject has been previously requested or is currently being processed in response to another

request. This helps to avoid duplication of efforts and is an efficient means of getting more

records to more requesters, while conserving RIDS limited resources. As a result of the FBI's

search of FDPS, RIDS located documents responsive to Plaintiffs' request in a first-party FOIPA

request[10] made on behalf of Jeffrey Epstein, which had been identified by an index search of the

CRS. The documents responsive to Epstein's FOIPA were also responsive to the Plaintiffs'

request; they had already been retrieved at the time RIDS did its inquiry and processing of those

records was underway. To ensure all responsive records were located from within the CRS,

RIDS conducted a supplemental search utilizing the search term "Jeffrey Epstein", and no

additional records were located responsive to Plaintiffs' request.

---

[10] The first-party FOIPA request sought main and cross-referenced records from January 1, 2000,
to November 25, 2012, on Jeffrey Epstein.

## JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

(43)    The FBI began processing documents in response to Plaintiffs' request long

before Mr. Epstein was arrested in 2019.  Accordingly, the FBI initially processed the records

relating to the prior FBI investigation and Mr. Epstein's 2008 conviction without reference to an

ongoing investigation.  After Mr. Epstein's arrest and the ongoing investigation became public in

July 2019, the FBI began to assert Exemption 7(A) with respect to withheld information.  In

addition, the FBI asserted Exemption 7(A) over all information that had been withheld under

other exemptions prior to that date, as noted in footnote 5, *supra*.  Thus, while Exemption 7(A)

was not included on the face of the documents that were processed and released in part prior to

July 2019, it has been added to the index for all such documents.  *See* Exhibit EE.  As to those

records that warranted categorical denial after the arrest of Mr. Epstein in July 2019, the review

is more fully explained in paragraphs 67 through 79, *infra.*

(44)    The FBI processed all documents responsive to Plaintiffs' request to achieve

maximum disclosure consistent with the access provisions of the FOIA.  Every effort was made

to provide Plaintiffs with all material in the public domain and with all reasonably segregable,

non-exempt information.  The FBI did not withhold any reasonably segregable, nonexempt

portions from Plaintiffs.  Further description of the information withheld, beyond what is

provided in this declaration, could identify the actual exempt information protected by the FBI.

The FBI Bates-stamped all pages that it processed prior to July 2019 consecutively as "03956-1

through 03956-11571."  These records are referred to in this declaration collectively as the

Bates-stamped or Bates-numbered records.[11]  On the pages released in full or in part, these

---

[11] In contrast, records processed after July 2019 were not Bates-stamped, as those records were
subject to categorical withholding per Exemption 7(A).  Thus, when I refer to the Bates-
numbered records, I am not including the records processed after July 2019 that were subject to

numbers are typically located at the bottom of each page. Attached to this declaration as Exhibit EE is an index of the Bates-stamped records that have been withheld in full or in part, with an explanation of the basis for each withholding.[12]

(45)    Additionally, with respect to the Bates-stamped records, the FBI further categorized its application of exemptions to provide additional detail regarding the nature of the information withheld. Specifically, the FBI applied numerical codes that coincide with various categories of exempt information. These coded categories are provided to aid the Court's and Plaintiffs' review of the FBI's explanations of the FOIA exemptions it has asserted to withhold the material. The uses of these codes, together with the information provided in this declaration, demonstrate that all material withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions, or is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

(46)    Each instance of information withheld pursuant to a FOIA Exemption is accompanied by a coded designation that corresponds to the categories listed below. For example, if "(b)(7)(C)-1" appears on a document, the "(b)(7)(C)" designation refers to FOIA Exemption 7(C) protecting against unwarranted invasions of personal privacy. The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into a more specific subcategory, such as "Names and Identifying Information of Third Parties of Investigative Interest."

---

categorical withholding. Those records, which will sometimes be referred to collectively as the categorically withheld records, are more fully addressed in ¶¶ 56-68, *infra*.

[12] FBI provided Plaintiffs a draft copy of the index. After the index was shared with Plaintiffs, FBI discovered a number of documents that were stamped with previously-used Bates numbers. As a result, the documents that were previously Bates-stamped 03956-10980 through 03956-11029 from the January 31, 2020, have been renumbered to 03956-11522 through 03956-11571. Exhibit EE has been edited to reflect the corrected Bates-numbers.

(47)    Listed below are the categories used to explain the FOIA exemptions the FBI

asserted to withhold information:

| SUMMARY OF EXEMPTION JUSTIFICATION CATEGORIES | |
|---|---|
| **Exemption 3** | **Information Protected by Statute** |
| (b)(3)-1 | Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509 |
| (b)(3)-2 | Grand Jury Information – Federal Rule of Criminal Procedure 6(e) |
| (b)(3)-3 | Juvenile Justice and Delinquency Act 18 U.S.C. § 5038 |
| **Exemption 5** | **Privileged Information** |
| (b)(5)-2 | Attorney Work Product |
| **Exemption 7(A)** | **Pending Law Enforcement Proceedings** |
| (b)(7)(A)-1[13] | Information Which, if Disclosed, Could Reasonably be Expected to Interfere with Pending Law Enforcement Proceedings |
| **Exemptions 6 & 7(C)** | **Unwarranted/Clearly Unwarranted Invasion of Personal Privacy** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information of Third Parties of Investigative Interest |
| (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Information of FBI Special Agents and Victim Specialists |
| (b)(6)-3 and (b)(7)(C)-3 | Names and/or Identifying Information Regarding a Third Party Victim |
| (b)(6)-4 and (b)(7)(C)-4 | Names and/or Identifying Information of Local Law Enforcement Personnel |
| (b)(6)-5 and (b)(7)(C)-5 | Names and/or Identifying Information of Third Parties Merely Mentioned |
| (b)(6)-6 and (b)(7)(C)-6 | Names and/or Identifying Information of Non-FBI Federal Government Personnel |
| (b)(6)-7 and (b)(7)(C)-7 | Names and/or Identifying Information of Local Government Personnel (Non-Law Enforcement and State) |
| (b)(6)-8 and (b)(7)(C)-8 | Names and/or Identifying Information of Third Parties who Provided Information |
| **Exemption 7(D)** | **Confidential Source Information** |
| (b)(7)(D)-1 | Names, Identifying Data and/or Information Provided by Individuals Under an Implied Assurance of Confidentiality |
| (b)(7)(D)-2 | Names, Identifying Data and/or Information Provided by Individuals Under an Expressed Assurance of Confidentiality |
| (b)(7)(D)-3 | Foreign Government Agency Information Under Implied Confidentiality |
| (b)(7)(D)-4 | Information Provided by a Local Law Enforcement Agency |

---

[13] As explained further herein, due to the current ongoing investigation, Exemption 7(A) must now be asserted to protect all redacted information, including the information redacted prior to the July 6, 2019, arrest of Mr. Epstein.

| Exemption 7(E) | Law Enforcement Techniques and Procedures |
|---|---|
| (b)(7)(E)-1 | Collection/Analysis of Information |
| (b)(7)(E)-3 | Sensitive File Numbers |
| (b)(7)(E)-4 | Dates/Types of Investigations |
| (b)(7)(E)-5 | Information Regarding Targets, Dates, and Scope of Surveillance |
| (b)(7)(E)-6 | Statistical Information Contained in Effectiveness Rating FD-515 |
| (b)(7)(E)-7 | Database Identifiers/Printouts |
| (b)(7)(E)-9 | Monetary Payments/Funding for Investigative Purposes |

### EXEMPTION 3 - INFORMATION PROTECTED BY STATUTE

(48)   5 U.S.C. § 552 (b)(3) exempts from disclosure information which is:

specifically exempted from disclosure by statute . . . if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the Open FOIA Act of 2009, specifically cites to this paragraph.

*(b)(3)-1: Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509*

(49)   In Exemption category (b)(3)-1, the FBI protected information pertaining to child victims and witnesses.  The privacy protection measures enacted in 1990, within the Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509, were created to protect minor children involved in criminal proceedings.   This statute was enacted well before the Open FOIA Act of 2009.  Moreover, it refers to particular types of matters that must be withheld from public disclosure.   Specifically, 18 U.S.C. § 3509(d) protects from disclosure certain records containing identifying information pertaining to children involved in criminal proceedings.  A child is defined in 18 U.S.C. § 3509(a)(2) as "a person who is under the age of 18, who is or is alleged to be (A) a victim of a crime of physical abuse, sexual abuse, or exploitation; or (B) a witness to a crime committed against another person." Accordingly, the FBI asserted Exemption 3, at times in conjunction with Exemptions 6, 7(C) and 7(D), to protect names, images, and identifying information of minor children victims and witnesses within the child prostitution investigation of Jeffrey Epstein.

*(b)(3)-2: Federal Grand Jury Information – Federal Rule of Criminal Procedure (6)(e)*

(50)    In Exemption category (b)(3)-2, the FBI protected Federal Grand Jury

information pursuant to Federal Rule of Criminal Procedure 6(e).  As relevant to 5 U.S.C. §

552(b)(3)(B), Rule 6(e) is a statute[14] enacted before the date of enactment of the OPEN FOIA

Act of 2009.[15]  It is well-established that Rule 6(e) embodies a broad, sweeping policy of

preserving the secrecy of grand jury material regardless of the substance in which the material is

contained.  Records responsive to Plaintiffs' request details matters occurring before one or more

federal grand juries empaneled in relation to the investigations at issue.  Specifically, the

investigative files contain information about the names of recipients of federal grand jury

subpoenas; information that identifies specific records subpoenaed by a federal grand jury; and

copies of specific records provided pursuant to federal grand jury subpoenas.  Wherever the FBI

protected this information, it found a clear nexus to federal grand jury proceedings on the face of

the responsive documents.  Any disclosure of this information would clearly violate the secrecy

of the grand jury proceedings and could reveal the inner workings of a federal grand jury.  Thus,

the FBI properly withheld this information pursuant to Exemption 3, in conjunction with Rule

6(e).

---

[14] As prescribed by 18 U.S.C. § 3771 (subsequently repealed by Pub.L. 100-702, Title IV, §
404(a)(1) (Nov. 19, 1988) and replaced by 28 U.S.C. § 2074), proposed rules become effective
ninety days after the Chief Justice reports them to Congress.  By order of April 26, 1976, the
Supreme Court adopted amendments to the Federal Rules of Criminal Procedure which included
Rule 6(e) and reported the amendments to Congress.  Congress voted to delay the effective date
of several of the proposed rules, to include Rule 6(e), "until August 1, 1977, or until and to the
extent approved by Act of Congress, whichever is earlier."  Pub. L. No. 94-349 § 1, 90 Stat. 822
(1976). Subsequently, Congress, by statute, enacted a modified version of Rule 6(e).  *See* Pub.L.
No. 95-78, § 2(a), 91 Stat. 319 (1977), FED. R. CRIM. P. 6(e).

[15] The OPEN FOIA Act of 2009 was enacted October 28, 2009.  *See* Pub.L. 111-83, 123 Stat.
2142, 2184.

*(b)(3)-3: Juvenile Justice and Delinquency Act – 18 U.S.C. § 5038*

(51)    The Juvenile Justice and Delinquency Act, 18 U.S.C. § 5038, protects from

disclosure all information and records relating to any juvenile delinquency proceeding, unless the

release is necessary to meet certain circumstances described within the statute. This statute was

enacted before the Open FOIA Act of 2009, but meets the standards of 5 U.S.C. 552 § (A)(ii) as

it establishes particular criteria for withholding and describes particular types of matters to be

withheld. The records at issue here contain arrest information and criminal history of third party

juveniles. Plaintiffs' request does not meet the specific circumstances set forth in the statute for

disclosure; therefore, the records are properly withheld pursuant to Exemption category (b)(3)-3.

Additionally, the FBI also asserted Exemptions 6 and 7(C) over all information that falls within

this category.

## EXEMPTION 5 – PRIVILEGED INFORMATION

(52)    FOIA Exemption 5 has been construed to exempt documents or information

normally privileged in the civil discovery context and incorporates the attorney work product

doctrine. In order to apply Exemption 5, agencies must first satisfy the threshold requirement –

*i.e.*, show that the information protected consists of "inter-agency or intra-agency" information.

Once the threshold is satisfied, agencies must satisfy the elements of the pertinent privilege.

*(b)(5)-2: Attorney Work Product Privilege*

(53)    In Exemption category (b)(5)-2, the FBI protected information subject to the

attorney work product doctrine. The attorney work product privilege protects such tangible and

intangible items as interviews, memoranda, correspondence, mental impressions, and personal

beliefs prepared or developed by an attorney, or at the direction of an attorney, in reasonable

anticipation of litigation. The privilege is predicated on the recognition that proper preparation

19

of a case depends on an attorney's ability to assemble information, sort relevant from irrelevant facts, and prepare his/her legal theories and strategies without intrusive or needless scrutiny.

(54)    The FBI relied on the attorney work product privilege to protect a small number of documents.  These documents include (i) two internal FBI memoranda which relay information provided by an AUSA relating to the timing of Epstein's indictment and information being gathered or gathered by the FBI, pursuant to the instruction of an AUSA, for the purpose of assessing a potential forfeiture action to seize Epstein's assets; (ii) one memorandum from an FBI investigator to an AUSA, relating to the value of an asset owned by Epstein for consideration of its seizure, with attachments providing supporting information gathered by the FBI regarding the value of the asset; (iii) an internal FBI memorandum that describes actions being taken by the FBI, at the direction of an AUSA, to gather evidence in support of a potential forfeiture action regarding certain of Epstein's assets; (iv) an internal FBI memorandum that describes actions being taken by the FBI, at the direction an AUSA, to gather evidence for the potential prosecution of Epstein and others and seizure of an asset.  The memoranda were created at the request of an AUSA in reasonable anticipation of litigation, and they provide the AUSA's prosecutorial strategy and the information the AUSA was gathering to either support an indictment of Jeffrey Epstein or a civil forfeiture action. These records are quintessential attorney work products and readily satisfy the elements of the attorney work product privilege because they were created at the direction of a prosecutor in anticipation of a potential prosecution of a child prostitution criminal case and related civil forfeiture action.

## EXEMPTION 7 THRESHOLD

(55)    Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law

enforcement purposes.  Pursuant to 28 U.S.C. §§ 533, 534, and Executive Order 12,333 as

implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM)

and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with

authority and responsibility to investigate all violations of federal law not exclusively assigned

to another agency, to conduct investigations and activities to protect the United States and its

people from terrorism and threats to national security, and further the foreign intelligence

objectives of the United States.  Under this investigative authority, the responsive records herein

were compiled in furtherance of the FBI's investigation of criminal child prostitution involving

Jeffrey Epstein.  As these records were compiled as part of the FBI's investigation of potential

federal crimes, they were compiled for law enforcement purposes.

### EXEMPTION 7(A)
### PENDING LAW ENFORCEMENT PROCEEDINGS

(56)     5 U.S.C. § 552 (b)(7)(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information…could reasonably be expected to interfere
> with enforcement proceedings.

(57)     Application of this exemption requires: the existence of law enforcement records;

a pending or prospective law enforcement proceeding; and a determination that release of the

information could reasonably be expected to interfere with the enforcement proceeding.  Often,

the FBI asserts Exemption 7(A) categorically to withhold a variety of different documents in an

investigative file, which the FBI then groups into functional categories and describes in greater

detail.  In this case, however, the FBI asserted Exemption 7(A) to protect the ongoing

prosecution of Jeffrey Epstein and then later, of his potential co-conspirators.  The release of this

information would reveal unknown information concerning pending enforcement procedures.

The FBI determined release of any of this material would provide criminals with information about the government's investigation/enforcement strategies in ongoing matters, allow them to predict and potentially thwart these strategies, and/or allow them to discover/tamper with witnesses and/or destroy evidence. As such, revealing this information could reasonably be expected to interfere with pending enforcement proceedings. Thus, the FBI has applied Exemption 7(A) to protect this information. Additional information regarding the nature of the on-going criminal enforcement proceedings, and the harms to those proceedings that could result from the release of these categories of records, is provided in the declaration of AUSA Maurene Comey.

## PROCESSING OF RECORDS AFTER ARREST OF MR. EPSTEIN ON JULY 6, 2019

*Types of Documents Categorically Denied Pursuant to FOIA Exemption 7(A)*

(58)     Providing a document-by-document description or listing of the records responsive to Plaintiff's request falling in the categorically denied records would undermine the very interests that the FBI seeks to protect under Exemption (b)(7)(A), in addition to the other exemptions identified below. In order to protect these interests, the FBI has described the types of responsive records from the pending investigative files, which are being withheld in full pursuant to FOIA Exemption (b)(7)(A). The pending investigative files contain the following types of documents:

(a) <u>FD-1057[16] - Electronic Communication ("EC")</u>: FD-1057s and ECs replaced the traditional FBI correspondence (i.e., Memoranda and Letters) as the primary vehicle of correspondence within the FBI. The purpose of an EC is to communicate within the FBI in a consistent format that can be uploaded by the originating Division or

---

[16] The designation "FD-" is attached to forms created and utilized internally by the FBI.

office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network. These forms are often utilized to record and disseminate intelligence/investigative information and for general investigation administration purposes.

(b) Interview Forms (FD-302): FD-302s are internal FBI forms in which evidence is often documented, usually as a result of FBI interviews. Such evidence and/or interview information may later be used as testimony or evidence in court proceedings/trials. Additionally, these evidence/interview forms are often incorporated in other FBI documents that may be used to disseminate intelligence/investigative information and can be utilized to set leads in furtherance of the FBI's investigative efforts.

(c) Handwritten Interview Notes: These are the original handwritten notes of FBI personnel who conducted interviews in the course of FBI investigations. These notes are almost always transposed into FD-302s and are utilized by the FBI in the same manner.

(d) State and Local Law Enforcement Documents: This category consists of documents provided to the FBI by state and local law enforcement agencies. These documents can be used as evidence in court proceedings, are often incorporated in other FBI documents that may be used to disseminate intelligence/investigative information, and can be utilized to set leads in furtherance of the FBI's investigative efforts.

(e) Documents Implementing Sensitive Investigative Techniques: These documents were utilized to implement a specific, sensitive, investigative technique. Describing these documents further would reveal this technique or sensitive data concerning this

23

technique.

(f) <u>Federal Grand Jury Subpoenas/Subpoenaed Information:</u> These documents consist of Federal Grand Jury Subpoenas and the documents collected as a result of these subpoenas. This information can be used as evidence in Grand Jury proceedings or other court proceedings. This information can also be incorporated in FBI documents that may be used to disseminate intelligence/investigative information, and can be utilized to set leads in furtherance of the FBI's investigative efforts.

(g) <u>FD-340, 1A Envelopes:</u> These envelopes are used to organize and store documents that need to be stored separately from the FBI file to which they are attached, due to their size. They usually contain handwritten notes of interviews, photographs, and other various evidentiary documents.

(h) <u>Other Investigative Documents:</u> The FBI uses various types of forms throughout a criminal investigation that do not fit into an official government format. Documents included in this category may include, but is not limited to, storage envelopes, bulky exhibit cover sheets, transmittal forms (e.g., facsimile cover sheets), letters, and routing slips. Additionally, this category consists of various types of documents reflecting information and evidence gathered during an FBI investigation, the sources from/by which such information and evidence was gathered, methods used to obtain the information and evidence, and methods used to analyze the information and evidence. To describe these investigative documents in this category any more specifically would reveal the scope of the FBI's investigations, as well as the sources and methods being utilized by the FBI.

(i) <u>Internet Printouts:</u> These documents consist of information that was located and

printed from public websites.  Disclosure of information gathered from a public source may itself reveal the direction or focus of an investigation by demonstrating what an investigator found relevant.

*Functional Categories of Information*

(59)    The FBI has reviewed and categorized the types of exempt records into three categories - Evidentiary/Investigative Materials, Administrative Materials and Public Source/Non-Investigative Harm Materials.  The categories will be discussed in more detail below.

(60)    A record can fall into one or more functional categories as described in the below paragraphs.  For example, a record, such as an FBI Investigative Report, may serve several purposes and may contain multiple categories of information, such as witness statements, administrative directions, and/or evidentiary materials.  Therefore, the information in each record could be included in multiple categories.

**Category 1: Evidentiary/Investigative Materials**

(61)    This category includes copies of records or evidence, analyses of evidence, and derivative communications discussing or incorporating evidence.  A derivative communication describes, verbatim or in summary, the contents of the original record, how it was obtained, and how it relates to the investigation.  Other derivative communications report this information to other FBI field offices, other law enforcement agencies, or other Federal agencies, either to advise them about the progress of the investigation, or to elicit their assistance in handling investigative leads.  The following subparagraphs describe the types of evidentiary materials in the responsive records and the anticipated harm that could reasonably result from the release of the materials.

25

(62)   Confidential Witness Statements:  Confidential witness statements are one of the principal tools used in proving the facts which form the basis for a prosecution.  These statements contain information obtained from confidential witnesses who have knowledge of the criminal activities that resulted in the investigation.  If the FBI were to release this information, the witnesses that have chosen to cooperate with law enforcement could be subjected to retaliation, intimidation, or physical or mental harm.  This could have a chilling effect on the future prosecution of this case inasmuch as potential witnesses might fear exposure and reprisals from the subjects of this investigation.  Implicit in conducting interviews in an investigation of this nature is the notion that an individual's identity and the information provided by them will be afforded confidentiality.  The FBI goes to great lengths to protect and maintain an individual's confidentiality since it is an integral part of a successful investigation and prosecution.  The release of witness statements would disrupt and harm potential investigative and/or prosecutorial actions.

(63)   Exchange of Information between FBI and Local Law Enforcement Agencies:  Release of information exchanged between the FBI and its local law enforcement partners would disclose evidence, investigative information, and criminal intelligence developed by various agencies that have cooperated with—and provided information and records to—the FBI in this ongoing investigation.  Release of information would identify the investigative interest of particular individuals; identify and tip off individuals who are of interest to law enforcement; and provide suspects or targets the opportunity to destroy evidence and/or alter their behavior to avoid detection.

**Category 2: Administrative Materials**

(64)   Materials falling within this category include items such as case captions,

26

identities of FBI field offices, dates of investigations, and detailed instructions designed to ensure that investigative procedures are conducted within the appropriate FBI and DOJ guidelines.  The following subparagraphs describe the types of administrative materials contained in the files and the anticipated harms that could reasonably result from the disclosure of such materials in the midst of this ongoing investigation, and prior to any prospective prosecutions.  In many instances, administrative information is contained at the beginning or end of correspondence or documents that fall within other categories of documents; therefore, to release details on this category of information would also reveal the investigative interests of the FBI and could enable suspects to discern a "road map" of the investigation.

(65)    Reporting Communications:  These communications permit an agency to monitor the progress of the investigation and to facilitate its conduct.  These communications have the potential to reveal or confirm the cooperation of other local or state government agencies in this investigation.  These communications are replete with detailed information about the FBI's investigative activities as well as detailed information about potential witnesses/confidential sources for interview.  Additionally, they contain background information about third-party individuals, the origins of pertinent information connecting them to the investigation, and their connections to subjects and their relationship with the pending investigation.  The release of this information would reveal the nature and scope of the ongoing investigation by revealing:  the investigative steps taken to obtain witness and source interviews; techniques and investigative methods used to compile and/or solicit information from various sources; and any potential or perceived challenges in the investigations.

(66)    Miscellaneous Administrative Documents: These materials include items such as transmittal forms and standardized forms used for a variety of purposes.  These types of

27

materials have been used throughout this investigation for many routine purposes; however, the manner in which they have been used and organized in the files also reveals information of investigative value. The disclosure of this information could undermine this pending and ongoing investigation as well as pending and prospective prosecutions.

**Category 3: Public Source/Non-Investigative Harm Materials**

(67)    The FBI released 46 pages to Plaintiffs of public source material not posing an investigative harm from within the investigative files. Prior to the shift in processing to the categorical review, the FBI released an additional 135 pages in full to Plaintiffs. The FBI determined that this information could be released without harm to the ongoing investigations, as the information is already known to the public and is not reasonably expected to interfere with pending criminal law enforcement proceedings or prosecutions. Thus, the disclosure of this information would not result in any of the various harms under Exemption 7(A) as described herein.

(68)    During the course of an FBI investigation, including this one, relevant and pertinent articles in newspapers, magazines or other periodicals are placed by FBI employees into the investigative file. These materials contain information obtained from public sources such as newspapers, on-line material, court transcripts, criminal affidavits, and other court filings. FBI employees place these public source materials into the file for background and review purposes. In this case, the public source material released to Plaintiffs consisted of news articles and various public court documents from Epstein's criminal case. Because the FBI had determined that the release of these specific public source documents would not harm or otherwise jeopardize the ongoing criminal investigation, the FBI did not withhold these documents from the Plaintiffs.

### EXEMPTIONS 6 AND 7(C)
### CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY
### AND UNWARRANTED INVASION OF PERSONAL PRIVACY

(69)    Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). All information that applies to a particular person falls within the scope of Exemption 6.

(70)    Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[17]

(71)    When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. For purposes of these exemptions, a public interest exists only when information about an individual, their name, or other factors that could potentially identify the individual[18]

---

[17] The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under both exemptions.

[18] As used herein, identifying information includes the following: dates of birth, places of birth, residences, telephone numbers, social security numbers, singular professional titles, statements, unique locations, and/or other information that is identifiable to an individual.

would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.  In each instance wherein information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure.

     (72)    Furthermore, since privacy concerns are typically obviated once an individual is deceased,[19] the FBI takes several steps, during FOIA processing, to ascertain the current life/death status of the individuals whose names are withheld.  The FBI uses the birth date and/or the date of the investigation to determine whether an individual is living or deceased, to the extent either or both of these pieces of information are discernable from the file.  The date of birth is used to apply the judicially-recognized "100-year rule," *i.e.*, if the individual was born more than 100 years ago, the FBI presumes that he or she is dead and the name and/or identifying information is released.  The FBI also uses institutional knowledge gained from prior FOIA requests or internal records.  By using institutional knowledge, the FBI can identify with sufficient certainty the life/death status of certain individuals.  If the FBI is unable to determine the life/death status of an individual through the use of these methods, the name and identifying information of the individual is withheld pursuant to Exemptions 6 and 7(C), when it finds disclosure would constitute an unwarranted invasion of those individuals' privacy should they still be living and no public interest would be served in releasing the names.  It is also the FBI's

---

[19] In some circumstances, surviving relatives of a deceased individual retain privacy interests in their information, even after the individual's death. *See generally National Archives v. Favish*, 124 S. Ct. 1570 (2004).

policy to release all names of high-ranking FBI officials in policy-making positions, as well as individuals in public positions, as they do not have privacy rights while acting in their official capacity. This policy is applied to the individual's position at the time of the creation of the document, and not the present.

### *(b)(6)-1 and (b)(7)(C)-1: Names and Identifying Information of Third Parties of Investigative Interest*

(73)     Within Exemption category (b)(6)-1 and (b)(7)(C)-1, the FBI protected the names and identifying information of third parties who were of investigative interest to the FBI. Being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, whether or not these individuals ever committed criminal acts. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Furthermore, it could result in professional and social repercussions, due to resulting negative stigmas. Accordingly, the FBI determined these individuals maintain substantial privacy interests in not having their identities disclosed. In contrast, disclosing personal information about these individuals would not significantly increase the public's understanding of the FBI's performance of its mission and so the FBI concluded that there was no public interest here sufficient to override these individuals' substantial privacy interests. For these reasons, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### *(b)(6)-2 and (b)(7)(C)-2: Names and Identifying Information of FBI Special Agents and Victim Specialists*

(74)     Within Exemption category (b)(6)-2 and (b)(7)(C)-2, the FBI protected the names and identifying information of FBI Special Agents ("SAs") and Victim Specialists. These FBI personnel were responsible for conducting, supervising, and/or maintaining the investigation/investigative activities related to the child prostitution investigation of Jeffrey

31

Epstein, reflected in the documents responsive to Plaintiffs' request. These responsibilities included, but are not limited to, the following: coordinating/completing tasks in support of the FBI's investigative and administrative functions, compiling information, and/or reporting on the status of the investigation.

(75)     Assignments of SAs to any particular investigation are not by choice. Publicity, adverse or otherwise, arising from a particular investigation, may seriously prejudice their effectiveness in conducting other investigations or performing their day-to-day work. The privacy consideration is also applied to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations/investigative activities, whether or not they are currently employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. The publicity associated with the release of an SA's identity in connection with a particular investigation could trigger hostility toward a particular SA. During the course of an investigation, an SA may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. Persons targeted by such investigations/investigative activities, and/or those sympathetic to those targeted, could seek to inflict violence on an SA based on their participation in an investigation. This is because an individual targeted by such law enforcement actions may carry a grudge against those involved with the investigation, which may last for years. These individuals may seek revenge on SAs and other federal employees involved in a particular investigation. There is no public interest served by disclosing the identities of the SAs because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities.

(76)     The role of a Victim Specialist is to aid with those who suffered through physical,

32

emotional, or financial harm as a result of a crime. A standard service provided by a Victim
Specialist, specifically within these documents is to accompany SAs to interviews and provide as
a critical link between the SAs and the victims for the Victim Assistance Program ("VAP").
VAP helps the victims cope and recover from the harm they have endured while allowing the
SAs to continue forward with their investigations. Protection of the Victim Specialists' identities
is not only imperative for their safety, but also the victims' safety and allows the victims to
confide to the FBI personnel involved in the investigation. Thus, disclosure of this information
would constitute a clearly unwarranted invasion of their personal privacy; and the FBI properly
withheld the names and identifying information of FBI SAs and Victim Specialists pursuant to
Exemptions 6 and 7(C).

### *(b)(6)-3 and (b)(7)(C)-3: Names and Identifying Information Regarding
Third Party Victims*

(77)    In Exemption category (b)(6)-3 and (b)(7)(C)-3, the FBI protected the names and
identifying information of third-party victims. Releasing these individuals' identities in the
context of these investigative records would cause embarrassment, as well as unsolicited and
unnecessary attention to be focused on these individuals. Such a release could force them to
relive emotionally trying events, causing further invasion of their privacy, in excess of the harms
they have already been forced to endure. Thus, these victims maintain strong privacy interests in
the protection of such personal information. Furthermore, there is no legitimate public interest to
be served by releasing the identities of these victims because their identities, themselves, would
not shed light on the operations and activities of the FBI. The FBI determined disclosure of this
information would constitute a clearly unwarranted invasion of these individuals' personal
privacy, and consequently withheld this information pursuant to FOIA Exemptions 6 and 7(C).
Accordingly, the FBI asserted this Exemption category, at times in conjunction with Exemptions

33

3 and 7(D).

### (b)(6)-4 and (b)(7)(C)-4: Names and Identifying Information of
### Local Law Enforcement Personnel

(78)     In Exemption category (b)(6)-4 and (b)(7)(C)-4 the FBI protected the names and

identifying information of local law enforcement employees.  These employees were acting in

their official capacities and aided the FBI in the law enforcement investigative activities reflected

in the records responsive to Plaintiffs' request.  The rationale for protecting the identities of FBI

SAs discussed in ¶¶ 74-76, *supra*, applies equally to the names and identifying information of

these local law enforcement employees.  Release of the identities of these law enforcement

employees could subject them as individuals to unnecessary and unwelcome harassment that

would invade their privacy and could cause them to be targeted for reprisal.  In contrast,

disclosure of this information would serve no public interest because it would not shed light on

the operations and activities of the FBI.  Accordingly, the FBI properly withheld this information

pursuant to Exemptions 6 and 7(C).

### (b)(6)-5 and (b)(7)(C)-5: Names and Identifying Information of
### Third Parties Merely Mentioned

(79)     In Exemption category (b)(6)-5 and (b)(7)(C)-5, the FBI protected the names and

identifying information of third parties who were merely mentioned in the investigative records

responsive to Plaintiffs' request.  The FBI has information about these third parties in its files

because these individuals were tangentially mentioned in conjunction with FBI investigative

efforts.  These individuals were not of investigative interest to the FBI.  These third parties

maintain substantial and legitimate privacy interests in not having this information disclosed and

thus, being connected with an FBI law enforcement matters.  Considering the FBI is an

investigative and intelligence agency, disclosure of these third parties' names and/or identifying

34

information in connection with an FBI record carries an extremely negative connotation.

Disclosure of their identities would subject these individuals to possible harassment or criticism

and focus derogatory inferences and suspicion on them. The FBI then considered whether there

was any public interest that would override these privacy interests, and concluded that disclosing

information about individuals who were merely mentioned in an FBI investigative file would not

significantly increase the public's understanding of the operations and activities of the FBI.

Accordingly, the FBI properly protected these individuals' privacy interests pursuant to FOIA

Exemptions 6 and 7(C).

### (b)(6)-6 and (b)(7)(C)-6: Names and Identifying Information of Non-FBI Federal Government Personnel

(80)    In Exemption category (b)(6)-6 and (b)(7)(C)-6, the FBI protected the names and

identifying information of personnel from non-FBI, federal government agencies who provided

information to or otherwise assisted the FBI in its investigation of Jeffrey Epstein. The rationale

for protecting the identities of other government employees is the same as the rationale for

protecting the identities of FBI employees. *See* ¶¶ 74-76, *supra*. Publicity, adverse or otherwise,

concerning the assistance of these other agency employees in an FBI investigation would

seriously impair their effectiveness in assisting or participating in future FBI investigations. The

privacy consideration also protects these individuals from unnecessary, unofficial questioning as

to the FBI investigation. It is possible for a person targeted by law enforcement action to carry a

grudge which may last for years, and to seek revenge on the personnel involved in the

investigation at issue in these FBI records. The publicity associated with the release of their

names and/or identifying information in connection with this investigation could trigger hostility

towards them by such persons. Therefore, these employees maintain substantial privacy interests

in not having their identities disclosed in this context. In contrast, there is no public interest to be

served by the disclosure of these employees' names and/or identifying information because their identities, by themselves, would not demonstrate how the FBI performed its statutory mission and thus, would not significantly increase the public's understanding of the FBI's operations and activities. Accordingly, the FBI properly protected these employees' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

### (b)(6)-7 and (b)(7)(C)-7: Names and Identifying Information of
### Local Government Personnel (Non-Law Enforcement)

(81)    In Exemption category (b)(6)-7 and (b)(7)(C)-7 the FBI protected the names and identifying information of local government personnel employees. The rationale for protecting the identities of local law enforcement personnel discussed in ¶ 78, *supra*, applies equally to the names and identifying information of these local government employees. Release of the identities of these local government employees could subject them as individuals to unnecessary and unwelcome harassment that would invade their privacy and could cause them to be targeted for reprisal. In contrast, disclosure of this information would serve no public interest because it would not shed light on the operations and activities of the FBI. Accordingly, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### (b)(6)-8 and (b)(7)(C)-8: Names and Identifying Information of
### Third Parties who Provided Information

(82)    In Exemption category (b)(6)-8 and (b)(7)(C)-8, the FBI protected the names and identifying information of individuals who were interviewed, and/or provided information by other means, to the FBI during the course of its investigation of Jeffrey Epstein.

(83)    The FBI has found information provided by individuals based on their personal knowledge is one of the most productive investigative tools for law enforcement agencies. The largest obstacle to successfully obtaining such information critical to FBI investigations, through

36

an interview or otherwise, is fear by the individuals providing the information their identities will

be exposed.  Such exposure, in conjunction with their cooperation with law enforcement, could

lead to harassment, intimidation by investigative subjects, legal or economic detriment, possible

physical harm, or even death.  In order to surmount their fear of reprisal, and the resulting

tendency to withhold information, persons who provide such information to the FBI must be

assured their names and personally-identifying information will be held in the strictest

confidence.  Thus, the FBI has determined these individuals maintain substantial privacy

interests in not having their identities disclosed.  In contrast, the FBI could identify no public

interest in the disclosure of this information because disclosure of these third parties' names and

identifying information would not shed light on or significantly increase the public's

understanding of the operations and activities of the FBI.  Furthermore, the continued access by

the FBI to persons willing to honestly relate pertinent facts bearing upon a particular

investigation far outweighs any benefit the public might derive from disclosure of the names of

those who cooperated with the FBI.  Accordingly, the FBI properly protected these individuals'

privacy interests pursuant to Exemptions 6 and 7(C).  The FBI is also relying on Exemption

7(D) to protect this information in many instances.

## EXEMPTION 7(D) – CONFIDENTIAL SOURCE INFORMATION

(84)    Exemption 7(D) protects "records or information compiled for law enforcement

purposes" when disclosure:

> could reasonably be expected to disclose the identity of a
> confidential source, including a State, local or foreign agency or
> authority or any private institution which furnished information on
> a confidential basis, and, in the case of a record or information
> compiled by a criminal law enforcement agency conducting a lawful
> national security intelligence investigation, information furnished
> by a confidential source.

5 U.S.C. § 552(b)(7)(D).

(85)    Numerous confidential sources report to the FBI on a regular basis; they provide information under express assurances of confidentiality and are "informants" within the common meaning of the term.  Others are interviewed and/or provide information under implied assurances of confidentiality (*i.e.*, under circumstances from which assurances of confidentiality may be inferred).  In either situation, these sources are considered to be confidential because they furnish information only with the understanding that their identities and the information they provided will not be divulged outside the FBI.  Information provided by these sources is singular in nature, such that it is often distinct and traceable to a specific individual and if released, could reveal their identities.  The FBI has learned through experience that sources assisting, cooperating with, and providing information to the FBI must be free to do so without fear of reprisal.  The FBI has also learned that sources must be free to furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation with the FBI will later be made public.  Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.

(86)    The release of a source's identity would forever eliminate that source as a future means of obtaining information.  In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources.  Such a result undermines one of the FBI's most important means of collecting information and could thereby severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal laws.

*(b)(7)(D)-1: Names, Identifying Information of, and Information Provided by Individuals under Implied Assurances of Confidentiality*

(87)    In Exemption category (b)(7)(D)-1, the FBI protected the names, identifying information of, and information provided by third parties under circumstances in which confidentiality can be inferred. These third parties provided information concerning the activities of subjects who were of investigative interest to the FBI. Considering 1) the singularity of the information provided and the likelihood these individuals could be identified through release of this information by those familiar with the events described; 2) the proximity of these sources to the investigative subjects and events they described; 3) and the nature of the criminal acts they described, the FBI inferred these individuals provided this information to the FBI only because they believed their cooperation with the FBI, and the information they provided, would remain confidential.

(88)    The FBI protected the identifying information of, and information provided by, individuals who conveyed critical information regarding criminal acts. These individuals were in unique positions allowing them ready access to and/or knowledge about investigative targets and others involved in child prostitution or trafficking of a minor. Such access exposed them to potentially significant harms should their association and cooperation with the FBI be publicly disclosed. One reason they risked harm when cooperating is they were within the orbit of suspected criminals, and such criminals (in the FBI's experience) typically seek to deter informants' cooperation with law enforcement through reprisal. Such reprisal can take many forms, to include defamation of the source's character among their peers/family; economic reprisal (deprivation of employment/business opportunities); violent threats aimed at instilling fear and doubt; or even violence itself. Even amidst these potential harms, these third-party sources provided specific, detailed information that is singular in nature – *i.e.,* only a few

individuals would be privy to such information.  Thus, the FBI determined disclosure of the

identities of these sources *and* the information they provided could subject these third parties, as

well as their families, to retaliation or backlash, should their information be disclosed.

(89)    Considering the circumstances described above, it is reasonable to infer these

third parties cooperated with the FBI only because they expected their identities and the

information they provided would be held in confidence.  Therefore, the FBI properly protected

the sources' identities and the information they provided pursuant to Exemption 7(D).

*(b)(7)(D)-2: Names, Identifying Information of, and Information Provided by Individuals*
*under Expressed Assurances of Confidentiality*

(90)    Within Exemption category (b)(7)(D)-2, the FBI protected the names, identifying

information of, and information provided by third parties to the FBI under express grants of

confidentiality.  When processing the records at issue, the FBI found evidence these individuals,

who provided specific and detailed information that is singular in nature, either requested their

identities not be revealed; and/or FBI investigators would have, by standard practice, expressly

promised these third parties their identities and the information they provided would remain

confidential.

(91)    Providing express assurances of confidentiality is essential to the FBI's ability to

obtain relevant and accurate information from Cooperating Witnesses ("CWs").  This

designation of CW is a positive indication these individuals entered into official, confidential

relationships with the FBI in which they would have, by standard FBI practice, been provided

with express assurances of confidentiality.  In sum, the FBI relied on certain individuals who

supplied information to the FBI with express assurance their names, identifying information, and

the information they provided would be held in confidence.  Release of such information would

endanger these confidential sources and cause great detriment to the FBI's ability to recruit and

40

maintain reliable confidential sources; thus, the FBI protected this information pursuant to Exemption 7(D).

### *(b)(7)(D)-3: Foreign Government Agency Information under Implied Confidentiality*

(92)    In Exemption category (b)(7)(D)-3, the FBI protected information provided to the FBI from a foreign agency under circumstances in which confidentiality can be inferred.  The FBI, in connection with a wide variety of criminal and national security investigations, solicits and receives information regularly from state, local, and foreign agencies and authorities. Inherent in the cooperative effort is the mutual understanding that the identity of such a source and the information provided by it will be held in confidence by the FBI, and not released pursuant to FOIA requests.  If disclosure of the information provided in confidence were to be made public pursuant to FOIA requests, cooperation between the FBI and the foreign agencies and authorities would be greatly diminished, causing great detriment to effective law enforcement.  The release of official United States Government documents that reveal the existence of a confidential relationship with a foreign government reasonably could be expected to strain relations between the United States and the foreign government and lead to diplomatic, political or economic retaliations.  A breach of this relationship can be expected to have at least a chilling effect on the free flow of vital information to the United States law enforcement agencies, which may substantially reduce their effectiveness.  Accordingly, the FBI properly withheld this information under FOIA Exemption 7(D).

### *(b)(7)(D)-4: Information Provided by Local Law Enforcement Agency*

(93)    Within Exemption category (b)(7)(D)-4, the FBI protected the names, identifying information of, and information provided by local law enforcement personnel under an implied assurance of confidentiality.  Certainly, the FBI does not infer that all state or local law

enforcement authorities who cooperate in federal investigations do so with expectations of

confidentiality. However, under some circumstances, such an expectation may be inferred.

Here, law enforcement authorities provided specific detailed information of value to the FBI, that

is singular in nature, concerning Jeffrey Epstein. The FBI inferred these personnel provided this

information to the FBI with an expectation their involvement in the investigation, and/or the

information they provided, would remain confidential due to the following: the information

provided pertains to unknown investigations pursued by these agencies; or the information would

expose the agency's personnel to undue public scrutiny based on their involvement with these

particular matters.

    (94)    The FBI relies heavily on assistance from its state and local law enforcement

partners in pursuing its law enforcement and intelligence gathering missions. The disclosure of

this information could have disastrous consequences. If this information were released to the

public under FOIA, these agencies would be less likely to freely share sensitive information with

the FBI. It could also harm the FBI's ability to seek support and or assistance from these

agencies during joint investigations. Additionally, the FBI's disclosure of such information

could 1) jeopardize these agencies' investigative techniques and procedures as disclosure would

allow criminals to predict and circumvent use of these techniques and procedures; 2) discredit

these state and local law enforcement authorities with current and future confidential sources,

and greatly hinder their ability to recruit their own valuable sources; and 3) would jeopardize

unknown investigations pursued by these agencies. Accordingly, it is reasonable for the FBI to

infer these state and local law enforcement authorities provided this information to the FBI under

circumstances in which an assurance of confidentiality can be implied. Thus, this information is

exempt from disclosure pursuant to FOIA Exemption 7(D).

## EXEMPTION 7(E)
## INVESTIGATIVE TECHNIQUES AND PROCEDURES

(95)   5 U.S.C. § 552(b)(7)(E) provides protection for:

> law enforcement records [which]…would disclose techniques and
> procedures for law enforcement investigations or prosecutions, or
> would disclose guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be expected to risk
> circumvention of the law.

(96)   Exemption (b)(7)(E) has been asserted to protect information from these records,

the release of which would disclose techniques and/or procedures for law enforcement

investigations or prosecutions, or would disclose guidelines for law enforcement investigations

or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

(97)   Within the responsive documents, the FBI applied Exemption (b)(7)(E) to non-

public investigative techniques and procedures utilized by the FBI to pursue its law enforcement

mission, and also to non-public details about techniques and procedures that are otherwise

known to the public.  Specifically, the FBI asserted Exemption 7(E) to protect the following

categories of information.

### (b)(7)(E)-1: Collection and Analysis of Information

(98)   In Exemption category (b)(7)(E)-1, the FBI protected the methods the FBI uses to

collect and analyze information it obtains for investigative purposes.  The release of this

information would disclose the identity of methods used in the collection and analysis of

information, including how and from where the FBI collects information and the methodologies

employed to analyze it once collected.  Such disclosures would enable subjects of FBI

investigations to circumvent similar currently used techniques.  The relative utility of these

techniques could be diminished if the actual techniques were released in this matter.  This in turn

would facilitate the accumulation of information by investigative subjects regarding the

circumstances under which the specific techniques were used or requested and the usefulness of the information obtained. Release of this type of information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities. Accordingly, the FBI has properly withheld this information pursuant to FOIA Exemption 7(E).

### *(b)(7)(E)-3: Sensitive File Numbers*

(99)    In Exemption category (b)(7)(E)-3, the FBI protected sensitive investigative file numbers. The FBI determined this Exemption is appropriate for protecting these file numbers as the release of file numbering convention identifies the investigative interest or priority given to such matters. The file numbers the FBI protected are not known to the general public. These file numbers contain three separate portions. The first portions of these file numbers consist of FBI file classification numbers which indicate the types of investigative/intelligence gathering programs to which these files pertain. Many of the FBI's classification numbers are public, which makes disclosure of this information even more telling. Release of known file classification numbers in the context of investigative records would immediately reveal the types of investigations being pursued, and thus the types of investigative techniques and procedures available to FBI investigators, and/or non-public facets of the FBI's investigative strategies. For example, revealing that the FBI has a money laundering investigative file on a subject who was only known to be investigated for crimes related to public corruption would reveal key non-public information about the FBI's investigative strategies and gathered evidence. Additionally, releasing non-public FBI file classification numbers would reveal critical information about non-

public investigative techniques and procedures, and provide criminals and foreign adversaries the

ability to discern the types of highly sensitive investigative strategies the FBI is pursuing

whenever such file classification numbers are present within these and other sensitive FBI

investigative records.

(100)   The protected investigative file numbers also contain two letter office of

origination codes, indicating which FBI field office or overseas FBI legal attaché originated the

investigations at issue.  Providing this information, in many instances, would provide critical

information about where and how the FBI detected particular criminal behaviors or national

security threats, and reveal key pieces about the FBI's non-public FBI investigations or

intelligence/evidence gathering sources and methods.  Revealing this information could also risk

disclosing unknown FBI investigations or intelligence gathering initiatives, by revealing interests

in varying areas of FBI investigative responsibility.  Releasing this information could also

possibly provide significant information about the FBI's failure to detect certain types of

criminal behavior.  For example, a criminal operating out of San Francisco, California with ties

to a criminal organization under investigation in the FBI's Seattle Field Office could request the

FBI's Seattle Field Office's investigative file.  If the FBI were to reveal all of the originating

office codes in the investigative files present in Seattle's file, and there was no indication the FBI

ever pursued an investigation in San Francisco, the criminal could reasonably assume the FBI

failed to locate any evidence of their wrongdoing, emboldening them to continue their activities,

undeterred.

(101)   The third portion of these investigative files consists of the numbers given to the

unique investigative initiatives these files were created to memorialize.  Releasing these singular

file numbers would provide criminals and foreign adversaries with a tracking mechanism by

which they can place particular files/investigations within the context of larger FBI investigative efforts. Continued release of sensitive investigative file numbers would provide criminals with an idea of how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies. This would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge-gaps in the FBI's gathered intelligence.

(102)   In summary, repeatedly releasing sensitive FBI investigative file numbers would allow determined criminals and foreign adversaries to obtain an exceptional understanding of the body of investigative intelligence available to the FBI; and where, who, what and how it is investigating certain detected activities. Release of this information would enable these criminals and foreign adversaries to predict FBI investigations and structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law. Accordingly, the FBI properly asserted FOIA Exemption 7(E) to protect this type of information.

*(b)(7)(E)-4: Dates/Types of Investigations*

(103)   In Exemption category (b)(7)(E)-4, the FBI protected information pertaining to the type of investigation referenced in the records at issue in this case. Specifically, some of the information withheld, when referenced in connection with an actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation and the dates the FBI initiated the investigations. Disclosure of this information would inform criminals the types of activities that would trigger a full investigation as opposed to a preliminary investigation, and the particular dates the investigations cover. Additionally, this information would also give criminals valuable insight into how the FBI develops its

investigations. Release of this information would allow investigative subjects to predict FBI investigative strategies and adjust their behavior accordingly. Moreover, revealing that a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid investigative scrutiny by the FBI. Disclosure of information related to the type of investigation could enable criminals to time and structure their illegal activities accordingly to circumvent the FBI's attempts to enforce federal laws; therefore, the FBI has properly withheld this information pursuant to Exemption 7(E). Accordingly, the FBI asserted this Exemption category, at times in conjunction with Exemptions 3, 6, and 7(C) to protect names and identifying information of third parties.

### (b)(7)(E)-5: Information Regarding Target, Dates, and Scope of Surveillance

(104)   In Exemption category (b)(7)(E)-5, the FBI protected information concerning the target, dates, and scope of the surveillance operation conducted by the FBI in relation to the investigation at issue here. The FBI utilized this surveillance operation to obtain investigative intelligence relevant to the investigation of Jeffrey Epstein. Certainly, it is publicly known that the FBI and other law enforcement agencies engage in different types of surveillance in investigations. However, disclosure of non-public details about who, when, how, and under what circumstances the FBI conducts surveillance would allow current and future subjects of FBI investigations and other potential criminals to develop and utilize countermeasures to defeat or avoid different types of surveillance operations, thus rendering the techniques useless to the FBI and other law enforcement agencies. This is especially true because the success of investigative surveillance hinges on investigators' abilities to remain undetected. Revealing any non-public details about the FBI's methodology for conducting surveillance could potentially jeopardize the FBI's ability to operate surveillance covertly, and risks circumvention of the law.

Accordingly, the FBI properly asserted Exemption 7(E) to withhold this information.

*(b)(7)(E)-6: Information Contained in Effectiveness Rating FD-515*

(105)   In Exemption category (b)(7)(E)-6, the FBI protected certain sensitive investigative information located within standardized FBI FD-515 forms. FD-515's are forms used by FBI personnel to report investigative accomplishments. FD-515s are submitted at various stages of an investigation to report important events such as an arrest, conviction, sentencing, asset seizure, and disruption/dismantlement of a criminal enterprise. The FBI asserted Exemption 7(E) to protect from disclosure statistical information concerning effectiveness ratings assigned to various FBI investigative techniques. At the upper right-hand side of this form is a block captioned "Investigative Assistance and Techniques Used." This block lists numerous publicly known investigative techniques and assistances, some of which were used by the investigative personnel during the FBI's investigation of Jeffrey Epstein. Opposite each investigative technique and assistance is a rating column which records a numerical rating from 1 to 4 to rate each technique/assistance used by investigative personnel during the course of the investigation. The numerical rating evaluates the effectiveness of each technique/assistance used in bringing the investigation to a successful conclusion. The entire rating column has been deleted to protect from release the various techniques and assistance used, and their effectiveness in the investigation. If the rating columns were released along with the ratings of each technique and assistance used, others involved in similar criminal activities could change their methods and modus operandi in order to circumvent and avoid detection and/or disruption by FBI investigators, through the use of these techniques, in the future. The protection of these rating columns is essential to prevent future circumvention of the law by criminals. Therefore, the FBI properly protected this information pursuant to FOIA Exemption

7(E).

(106)   Additionally, the FBI asserted Exemption 7(E) to withhold the "Assisting

Agencies" portions of the FD-515s within the responsive records.  This was done to neither

confirm nor deny if any other federal, state, or local agencies assisted the FBI in law enforcement

activities.  This is standard RIDS processing policy for all FD-515 Accomplishment Reports and

associated documents.  Affirmatively acknowledging which law enforcement agencies (whether

state, local, or federal) assisted the FBI in its investigative efforts of the subjects of FD-515s

risks confirming unknown investigative interests of other law enforcement agencies by revealing

these other agencies' interests in the subject.  Such revelations would allow subjects to predict

law enforcement actions, modify their behavior in a manner which avoids the investigative

efforts of law enforcement, and enable them to circumvent the law.  Furthermore, if this portion

of the FD-515 is blank, thus revealing no other agencies assisted the FBI, criminals would be

able to discern if some of their criminal behaviors have gone undetected.  This risks emboldening

such criminals to continue undetected criminal activities.  It would also allow them to judge law

enforcement agencies' strengths and weaknesses in regards to detecting/disrupting particular

criminal activities; structure their activities to exploit this knowledge; and successfully evade law

enforcement agencies' efforts to enforce the law.  Accordingly, only by employing the practice

of always redacting this portion of FD-515s is the FBI able to avoid the substantial law

enforcement circumvention risks enumerated above; thus, the FBI properly withheld this

information pursuant to FOIA Exemption 7(E).

### (b)(7)(E)-7: Database Identifiers/Printouts

(107)   In Exemption category (b)(7)(E)-7, the FBI protected the identities of sensitive

investigative databases and database search results located through queries of these non-public

databases used for official law enforcement purposes by the FBI. Releasing the identities of these databases and any information located through queries of these databases would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations (*i.e.*, the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases).

(108)   Revealing the use of these databases in the context of FBI investigative records, and the information generated through queries of these databases, would reveal the nature of their utility to FBI investigators and the scope of information stored within the databases. Disclosing when and why the FBI queries these databases would reveal key information about FBI investigative strategies. This is because different investigative databases contain varying datasets and revealing the types of data sought by investigators in particular investigative circumstances would reveal the FBI strategies employed in response to different investigative circumstances. Additionally, disclosing the search results for particular subjects would provide criminals with an understanding of the scope of FBI collected intelligence on particular subjects. It would expose possible intelligence gaps and/or intelligence gathering strengths. This would allow criminals to make informed decisions on how they might structure their behavior to exploit these strengths and weaknesses and avoid detection and/or disruption by the FBI.

(109)   Revealing the types of information stored in these databases would also reveal the types of information most useful to FBI investigators. This would provide criminals with an understanding of how they might structure their behavior and/or deploy countermeasures to deprive the FBI of useful intelligence/evidence, thus jeopardizing the FBI's investigative mission.

(110)   Finally, revealing the identities of these databases could jeopardize the FBI's investigative mission by revealing exactly where the FBI is storing and obtaining valuable investigative data. Knowing the database names makes the original source data an attractive target for compromise. It would allow criminals who gain access to FBI systems an idea of where they can go to discover what the FBI knows, how it gathered the information, and possible information regarding the FBI's investigative strategies. It would also offer these criminals the opportunity to corrupt or destroy information stored within these databases.

(111)   In summary, release of this information relative to FBI investigation databases impedes the FBI's effectiveness and potentially aids in circumvention of valuable investigative techniques. Therefore, the FBI withheld this information pursuant to Exemption 7(E).

*(b)(7)(E)-9: Monetary Payments/Funding for Investigative Purposes*

(112)   In Exemption category (b)(7)(E)-9, the FBI protected information about monetary amounts requested by FBI personnel and/or paid by the FBI in order to implement particular investigative techniques. The FBI has limited resources that it must allocate strategically in order to effectively pursue its law enforcement and intelligence gathering missions. Revealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts and priority given to certain investigative matters. Revealing this level of focus would reveal how the FBI plans to allocate its limited resources and essentially paint a picture as to where the FBI's strengths and weaknesses lie within the spectrum of illegal activities it is mandated to investigate. Releasing this information would give criminals the opportunity to structure their activities in a manner which avoids the FBI's strengths and exploits its weaknesses. Because release of this type of information would enable criminals to

circumvent the law, this information has been properly withheld pursuant to Exemption 7(E).

## WITHHOLDING OF DOCUMENTS UNDER A SEALED COURT ORDER

(113)   The FBI has withheld 38 pages in full per a Court Order issued by the United States District Court for the Southern District of Florida in Case Number 08-mj-08068-LRJ. The FBI searched for any unsealing order in the Public Access to Court Electronic Records ("PACER"), and the records responsive to Plaintiffs' request are still sealed. Therefore, the FBI withheld responsive information subject to the sealing order, which precludes release of the following pages by the FBI: Bates pages 03956-1033 through 03956-1070. Due to the sealing order, these pages were not reviewed for applicable FOIA exemptions. Should the court lift the sealing order, the FBI respectfully requests an opportunity to assert applicable FOIA exemptions.

## SEGREGABILITY

(114)   As discussed in ¶ 4 *supra*, the FBI processed a total of 11,571 responsive pages within the category of Bates-stamped records: 181 were released in full ("RIF"), 1,051 were released in part ("RIP"), and 10,339 were withheld in full ("WIF"). Each of these categories is discussed below to further address segregability.

    a.  Pages RIF. Following its segregability review, RIDS determined 181 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption.

    b.  Pages RIP. Following its segregability review, RIDS determined 1,051 pages could be released in part with redactions per the identified FOIA exemptions herein. These pages comprise a mixture of material that could be segregated for release and material that was withheld as release would

trigger foreseeable harm to one or more interests protected by the cited

FOIA exemptions on these pages.

c.   Pages WIF.  Following its segregability review, RIDS determined 10,339

pages required withholding in their entirety.  RIDS determined all

information on these pages was either fully covered by one or more of the

cited FOIA exemptions or determined that any non-exempt information on

these pages was so intertwined with exempt material, no information could

be reasonably segregated for release.  Any further segregation of this

intertwined material would employ finite resources only to produce

disjointed words, phrases, or sentences, that taken separately or together,

would have minimal or no informational content.  Additionally, the FBI

withheld 38 pages because they were deemed to be currently sealed

pursuant to a United States District Court order, as described at ¶ 113,

*supra.*  Also, the FBI withheld 123 pages because they were duplicates of

pages accounted for elsewhere in the FBI's production.  It is the FBI's

standard practice not to process duplicate pages, as doing so expends finite

processing resources with a net result of no additional information being

released to requesters.

## CONCLUSION

(115)  The FBI performed adequate and reasonable searches for responsive records;

processed all such records and released all reasonably segregable non-exempt information from

documents responsive to Plaintiffs' FOIA request that are subject to FOIA.  The FBI processed

the records under the access provisions of the FOIA to achieve maximum disclosure.

Information was properly withheld pursuant to FOIA Exemptions 3, 5, 6, 7(A), 7(C), 7(D), and 7(E). The FBI carefully examined the documents and determined the information withheld from Plaintiffs in this case, if disclosed, would reveal statutorily protected information; would reveal privileged information; could reasonably be expected to interfere with pending or prospective enforcement proceedings; would cause a clearly unwarranted invasion of personal privacy, or could reasonably be expected to constitute an unwarranted invasion of personal privacy; could reasonably be expected to disclose the identities of confidential sources and the information they provided; and/or would disclose techniques and procedures for law enforcement investigations. After extensive review of the documents at issue, I have determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through EE attached hereto are true and correct copies.

Executed this _28th_ day of June 2021.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia