UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RADAR ONLINE LLC and JAMES
ROBERTSON,

                              Plaintiffs,

            - against -

FEDERAL BUREAU OF
INVESTIGATION,

                              Defendant.

**MEMORANDUM**
**OPINION & ORDER**

17 Civ. 3956 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            Plaintiffs Radar Online LLC and James Robertson bring this action under the

Freedom of Information Act ("FOIA"), seeking records related to the FBI's investigation and

prosecution of financier Jeffrey Epstein for child sex trafficking crimes.  (See Am. Cmplt. (Dkt.

No. 12))  Plaintiff Radar Online is an online investigative news outlet and Plaintiff Robertson is

one of its senior editors.  (Id. ¶¶ 2-3)

            Plaintiffs submitted their FOIA request on the Federal Bureau of Investigation

("FBI") on April 20, 2017.  (Id.¶ 10)  After receiving no response, Plaintiffs commenced this

action on May 25, 2017.  (Cmplt. (Dkt. No. 1))  The Amended Complaint was filed on August

28, 2017.  (Am. Cmplt. (Dkt. No. 12))  After an initial case management conference on

September 7, 2017, the FBI agreed to begin producing documents at a rate of 500 pages per

month.  As of December 8, 2020, the FBI had reviewed 11,571 responsive pages, most of which

were redacted in part or withheld in full based on certain exemptions to disclosure under FOIA,

including exemptions 3, 6, 7(C), 7(D), and 7(E).  (See Dec. 8, 2020 Joint Ltr. (Dkt. No. 25) at 1)[1]

---

[1]  The page numbers referenced in this opinion correspond to the page numbers designated by
this District's Electronic Case Filing ("ECF") system.

On July 6, 2019, Jeffrey Epstein was arrested and charged with new Federal offenses, at which point the FBI asserted Exemption 7(A) to FOIA – the exemption for "records or information compiled for law enforcement purposes[,] . . . [the disclosure of which] could reasonably be expected to interfere with enforcement proceedings" 5 U.S.C. § 552(b)(7)(A) – over the 10,107 pages that were previously processed and withheld and over all "remaining responsive records."  (Id.)

On December 10, 2020, this Court directed the parties to file cross-motions for summary judgment.  (Dkt. No. 26)

For the reasons stated below the parties' cross-motions will each be granted in part and denied in part.

## BACKGROUND

## I.    FACTS

In support of its summary judgment motion, the FBI submitted a declaration from Maureen Comey, an Assistant United States Attorney ("AUSA") in the United States Attorney's Office for the Southern District of New York.  (2021 Comey Decl. (Dkt. No. 39) ¶ 1)  Comey is one of the AUSAs "handling the prosecution of Ghislaine Maxwell" and, prior to Epstein's death, was one of the AUSAs "in charge of [his] prosecution."  (Id.)  The FBI has also submitted a declaration from Michael G. Seidel, the Section Chief of the Record/Information Dissemination Section ("RIDS") of the FBI's Information Management Division ("IMD").  (Seidel Decl. (Dkt. No. 50) ¶ 1)  Attached as exhibits to Seidel's declaration are, inter alia, Plaintiff's FOIA request and the FBI's response.[2]  (Dkt. Nos. 50-1, 50-2)

---

[2]  Local Rule 56.1 requires those moving for summary judgment to "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).

Epstein was a financier who in June 2008 pleaded guilty to "a criminal charge of procuring prostitution of a minor," and served thirteen months of an eighteen-month sentence. (Seidel Decl. (Dkt. No. 50) ¶ 5)  On July 2, 2019, Epstein was indicted by a federal grand jury in this District on "one count of conspiracy to commit sex trafficking . . . [and] one count of sex trafficking."  (Id. (citing United States v. Epstein, 19 Cr. 490 (RMB) (S.D.N.Y.), Indictment (Dkt. No. 2)))  Epstein committed suicide at the Metropolitan Correction Center in Manhattan on August 10, 2019, while the charges against him were pending.  (Id. (citing United States v. Epstein, 19 Cr. 490 (RMB), Nolle Prosequi (Dkt. No. 52)))  Epstein's 2019 indictment, arrest, and death were the subject of extensive media coverage.

### A.    Plaintiff's FOIA Request and the Instant Action

On April 20, 2017, Plaintiff Robertson submitted a FOIA request to the FBI seeking "all documents relating to the FBI's investigation and prosecution" of Epstein.  (Seidel Decl., Ex. A. (FOIA Request) (Dkt. No. 50-1) at 4)  Plaintiff asked that his FOIA request receive expedited treatment.  (Id. at 5)

On April 28, 2017, the FBI sent Robertson a letter confirming receipt of his FOIA request and informing him that because he had requested information about a "third party individual[]" – Epstein – "the FBI would neither confirm nor deny the existence of such records pursuant to FOIA Exemptions 6 and 7(C)."[3]  (Seidel Decl. (Dkt. No. 50) ¶ 7)  The FBI informed

---

Neither side has submitted a Rule 56.1 statement here.  However, "the general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment." Ferguson v. Fed. Bureau of Investigation, 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995) (citing Carney v. United States Dept. of Justice, 19 F.3d 807, 812 (2d Cir. 1994)).  Accordingly, this Court will not require the submission of Local Rule 56.1 statements.

[3] FOIA Exemption 6 provides that "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" are exempted from disclosure.  5 U.S.C. § 552(b)(6).  Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the

Roberts that it was closing his request, and provided information about "making requests for records on third party individuals" and about appealing the FBI's determination.  (Id.; see also id., Ex. B (FOIA Response) (Dkt. No. 50-1))

Plaintiffs filed the instant action on May 25, 2017 (Cmplt. (Dkt. No. 1)), and filed the Amended Complaint on August 28, 2017.  (Am. Cmplt. (Dkt. No. 12))  In a stipulation so-ordered by this Court on October 5, 2017, Plaintiffs agreed to "limit the scope of their [FOIA] request to the records located in" certain files identified by the FBI in their search for responsive records.  (Dkt. No. 17)  The parties also agreed that the FBI would process 500 pages of the records per month, starting October 1, 2017.  (Id.)

Between October 2017 and Epstein's July 2019 indictment the FBI processed 500 pages of the records per month.[4]  (Seidel Decl. (Dkt. No. 50) ¶¶ 9-29)  Following Epstein's July 2019 indictment, the FBI "withheld in full all remaining responsive records" and "all previously protected information" pursuant to Exemption 7(A).  (Id. ¶ 30 & n.4)

"By letter dated January 31, 2020, the FBI . . . released 46 [additional] pages of records in full or part."  (Id. ¶ 31)  In total, "the FBI processed on a document-by-document basis a total of 11,571 pages of responsive records.  Of these pages, the FBI released 181 pages in full, released 1,051 pages in part, and withheld 10,339 pages in full."  (Id. ¶ 3)  The records were withheld because one or more FOIA Exemption applied, the pages were "duplicative of other pages" already produced by the FBI, "and/or the pages are sealed pursuant to [a court order]." (Id. ¶ 3)  The FBI does not state how many records comprise the "remaining responsive records"

_____

production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  Id. § 552(b)(7)(C).

[4]  The FBI notes that no records were produced between January and March 2019 "because of the lapse in appropriations funding for the Department of Justice" during that time.  (Seidel Decl. (Dkt. No. 50) n.3)

that were reviewed on a "categorical basis," and over which the FBI has asserted only Exemption

7(A).  (See id. ¶ 44 & n.11) The FBI likewise has not disclosed how many records were

"categorically withheld" pursuant to Exemption 7(A).  The FBI's Vaughn index[5] addresses only

the records processed before Epstein's indictment and does not address the categorically

withheld records.  (Id. ¶ 44)

### B.    The Prosecution of Ghislaine Maxwell

On June 29, 2020, Ghislaine Maxwell – "an individual who associated with

Jeffrey Epstein" (2021 Comey Decl. (Dkt. No. 39) ¶ 1) – was indicted by a grand jury in this

District on "one count of conspiracy to entice minors to travel to engage in illegal sex acts"; "one

count of enticement of a minor to travel to engage in illegal sex acts"; "one count of conspiracy

to transport minors with intent to engage in criminal sexual activity"; "one count of

transportation of a minor with intent to engage in criminal sexual activity"; "and two counts of

perjury."  (Id. ¶ 6)

On December 29, 2021, a jury found Maxwell guilty on five of the six counts

against her.  (2023 Comey Decl. (Dkt. No 47) ¶ 6; 20 Cr. 330, Dkt. Sheet at Dec. 29, 2021)  On

June 28, 2022, Maxwell was sentenced to 20 years' imprisonment.  (2023 Comey Decl. (Dkt. No

47) ¶ 6; 20 Cr. 330, Judgment (Dkt. No. 696))

---

[5] A "'Vaughn index is an affidavit that specifically describes the withheld or redacted documents
and justifies, in detail, why each withheld record that would be responsive to the request is
exempt from disclosure under FOIA.'"  Heartland All. for Hum. Needs & Hum. Rts. v. United
States Immigr. & Customs Enf't, 406 F. Supp. 3d 90, 125 (D.D.C. 2019) (quoting Campaign For
Responsible Transplantation v. U.S. Food And Drug Admin., 180 F. Supp. 2d 29, 32 (D.D.C.
2001)).

On July 7, 2022, Maxwell appealed her conviction to the Second Circuit. (2023 Comey Decl. (Dkt. No 47) ¶ 7) Maxwell seeks, inter alia, "a new trial based on alleged juror misconduct and alleged evidentiary issues." (Id.) Her appeal remains pending. (Id. ¶ 8)

## II. <u>PROCEDURAL HISTORY</u>

The Complaint was filed on May 25, 2017 (Cmplt. (Dkt. No. 1)), and the Amended Complaint was filed on August 28, 2017. (Am. Cmplt. (Dkt. No. 12)) After the FBI asserted that Exemption 7(A) categorically applies to the documents it had previously withheld, as well as all remaining responsive documents, the Court directed the FBI to produce a <u>Vaughn</u> index by July 1, 2020. (Dkt. No. 21) On December 2, 2020, this Court ordered the parties to provide a status update (Dkt. No. 24), and on December 10, 2020, the Court directed the parties to file cross-motions for summary judgment. (Dkt. No. 26) The FBI requested several extensions, which this Court granted, and the parties' motions were not fully briefed until October 29, 2021. (Dkt. Nos. 27-37, 42)

Two months later, Maxwell was convicted at trial. (2023 Comey Decl. (Dkt. No. 47) ¶ 6) Because the parties' summary judgment briefing "turn[ed] on the ongoing prosecution of Ghislaine Maxwell,"[6] this Court ordered the parties to submit supplemental briefing and declarations addressing the impact of Maxwell's conviction "on the parties' [cross] motions." (June 30, 2023 Order (Dkt. No. 45)) The FBI submitted a supplemental brief and declaration from Maureen Comey on July 11, 2023 (Dkt. Nos. 46-47), and Plaintiffs filed a supplemental brief on July 20, 2023. (Dkt. No. 48)

---

[6] In seeking summary judgment, the FBI argued, inter alia, that releasing the records (1) would "allow Maxwell earlier or greater access to agency investigatory files than she otherwise would have through the criminal discovery process"; (2) might improperly "influenc[e] witness testimony"; and (3) might "impair the ability to seat a fair and impartial jury in the <u>Maxwell</u> trial." (Def. Br. (Dkt. No. 38) at 16-18).

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Summary Judgment Standard

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

"[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Id. (internal citations omitted).

    **B.**    **Summary Judgment in FOIA Cases**

"Summary judgment is the procedural vehicle by which most FOIA actions are resolved."  Jones-Edwards v. Appeal Bd. of Nat. Sec. Agency Cent. Sec. Agency, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005).  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that [1] its search was adequate[,] and [2] any withheld documents fall within an exemption to the FOIA."  Carney v. U.S. Dept. of Justice, 19 F.3d 807, 812 (2d Cir. 1994).

A government agency may sustain its burden through "'[a]ffidavits or declarations [that] supply[] facts indicating that the agency has conducted a thorough search and [that] giv[e] reasonably detailed explanations why any withheld documents fall within an exemption.'"  Associated Press v. U.S. Dept. of Justice, 2007 WL 737476, at *3 (S.D.N.Y. Mar. 7, 2007) (quoting Carney, 19 F.3d at 812); accord Garcia v. U.S. Dept. of Justice, Office of Info. & Privacy, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002).  "'[T]he general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment,' and Local Civil Rule 56.1 statements are not required."  N.Y. Times Co. v. U.S. Dept. of Justice, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (quoting Ferguson v. FBI, 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), aff'd, 83 F.3d 41 (2d Cir. 1996)).  "Affidavits submitted by an agency are presumed to have been made in good faith."  Garcia, 181 F. Supp. 2d at 366.

"[D]iscovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." Carney, 19 F.3d at 812. "A district court . . . may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 (2d Cir. 1999) (emphasis in original) (quoting Gallant v. N.L.R.B., 26 F.3d 168, 171 (D.C. Cir. 1994)). A plaintiff may avoid summary judgment and obtain discovery where, "once the agency has satisfied its burden, the plaintiff . . . make[s] a showing of bad faith on the part of the agency . . . or provide[s] some tangible evidence that the exemption claimed by the agency should not apply." Conti v. U.S. Dept. of Homeland Sec., 2014 WL 1274517, at *10 (S.D.N.Y. Mar. 24, 2014).

## II.    FOIA EXEMPTION 7(A)

The FBI argues that all of the withheld records responsive to Plaintiffs' FOIA request were properly withheld under Exemption 7(A) to FOIA.[7] (See 2021 Comey Decl. (Dkt. No. 39); 2023 Comey Decl. (Dkt. No. 47)) Plaintiff contends that (1) "FOIA does not allow agencies to retroactively redact material based on developments that post-dated their decision to withhold"; (2) the "FBI's declarations fail to explain how release of the records would interfere with Maxwell's prosecution"; and (3) the "FBI failed to undertake the required segregability analysis." (Pltf. Br. (Dkt. No. 43) at 11-18)

---

[7]  The FBI also contends that its search for responsive records was adequate. (See Def. Br. (Dkt. No. 38) at 12-14) Plaintiff does not dispute this point, however. (See Pltf. Br. (Dkt. No. 43); Pltf. Reply Br. (Dkt. No. 44); Pltf. Supp. Reply (Dkt. No. 48)) Accordingly, this Court addresses only the second step of the analysis – whether Exemption 7(A) applies to the withheld material. See Carney, 19 F.3d at 812.

A.    **Applicable Law**

Exemption 7(A) to FOIA permits government agencies to withhold "records or information compiled for law enforcement purposes" where "the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  "This exemption 'prevent[s] harm to the government's case in court by not allowing litigants earlier or greater access to agency investigatory files than they would otherwise have.'"  N.Y. Times Co. v. United States Dept. of Justice, 2016 WL 5946711, at *7 (S.D.N.Y. Aug. 18, 2016) (quoting Conti, 2014 WL 1274517, at *22).  "[I]f the exemption applies, it 'will justify denial of release, not only to the objects of the investigation and any pending or prospective enforcement actions, but to third parties as well.'"  Stein v. U.S. Sec. & Exch. Comm'n, 2017 WL 3141903, at *11 (D.D.C. July 24, 2017) (quoting Kanter v. IRS, 433 F. Supp. 812, 817 (N.D. Ill. 1977)).

In order to demonstrate that Exemption 7(A) applies, the government must satisfy three elements.  First, as a threshold matter, the government must show that "that the requested records were compiled for law enforcement purposes."  Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO v. Gen. Servs. Admin., 1998 WL 726000, at *7 (S.D.N.Y. Oct. 15, 1998) (internal quotation marks omitted).  Second, the government must show that "a law enforcement proceeding is pending or prospective."  Amnesty Int'l USA v. C.I.A., 728 F. Supp. 2d 479, 525 (S.D.N.Y. 2010).  With respect to this element, "it is sufficient that the government's ongoing . . . investigation is likely to lead to [law enforcement] proceedings."  Azmy v. U.S. Dept. of Def., 562 F. Supp. 2d 590, 605 (S.D.N.Y. 2008).  Third, the government must show that "release of the information could reasonably be expected to cause some articulable harm."  Amnesty Int'l, 728 F. Supp. 2d at 525.

"'[A]lthough [courts] give deference to an agency's predictive judgment of the harm that will result from disclosure of information, it is not sufficient for the agency to simply assert that disclosure will interfere with enforcement proceedings; it must rather demonstrate how disclosure will do so.'" Stein, 2017 WL 3141903, at *9 (quoting Citizens for Responsibility & Ethics in Wash. v. U.S. Dept. of Justice ("CREW I"), 746 F.3d 1082, 1096 (D.C. Cir. 2014)) (emphasis in CREW I).  "Ultimately, the government must 'allow[] the court to trace a rational link between the nature of the document and the alleged likely interference.'"  N.Y. Times Co., 2016 WL 5946711, at *7 (quoting Ctr. for Nat'l Sec. Studies v. U.S. Dept. of Justice, 331 F.3d 918, 940 (D.C. Cir. 2003)).

### B.   Whether the FBI's Invocation of Exemption 7(A) was Timely

Plaintiffs contend that the FBI's invocation of Exemption 7(A) was untimely. (Pltf. Br. (Dkt. No. 43) at 11-14)  It is the "'general rule'" in FOIA cases that "'a FOIA decision is evaluated as of the time it was made and not at the time of a court's review.'"  ACLU v. NSA, 925 F.3d. 576, 602 (2d. Cir. 2019) (quoting New York Times Co. v. U.S. DOJ, 756 F.3d 100, 111 (2d Cir.), as amended, 758 F.3d 436 (2d Cir. 2014), and supplemented, 762 F.3d 233 (2d Cir. 2014)).  According to Plaintiffs, the FBI is not entitled to rely on Exemption 7(A) at summary judgment, "because there were no active 'enforcement proceedings' at the time of Plaintiffs' requests."  (Pltf. Br. (Dkt. No. 43) at 11-12)  But "Plaintiffs' requests" are not the "FOIA decision" of which the Second Circuit speaks.  Indeed, Plaintiffs have not cited any case holding that government agencies may only rely on exemptions applicable at the time a FOIA request is submitted.

While in ACLU the Second Circuit "reaffirm[ed] the general rule . . . that a court reviewing a[n] [agency's] FOIA decision must not order reprocessing simply to reassure itself

that a correct decision remains current," ACLU, 925 F.3d. at 602, this rule exists to preserve judicial economy and to limit the burdens of FOIA requests on agencies, not to prevent agencies from asserting applicable exemptions when they arise during document processing.  See ACLU, 925 F.3d at 602 ("'[T]o require an agency to adjust or modify its FOIA response based on post-response occurrences could create an endless cycle of judicially mandated reprocessing each time some circumstance changes.'") (quoting Florez v. Cent. Intel. Agency, 829 F.3d 178, 188 (2d Cir. 2016)).

In sum, the "FOIA decision" under review here is the FBI's decision to withhold responsive documents pursuant to various exemptions, including Exemption 7(A).  (See Pltf. Br. (Dkt. No. 43) at 9-10 ("[Following the] July 2019[] . . . indictment of Epstein[,] . . . in the twenty-second monthly production to Plaintiffs (out of twenty eight total), the FBI for the first time invoked the law enforcement exemption, Exemption 7(A) categorically over all the remaining responsive documents."))  Bonner v. U.S. Dep't of State, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("In FOIA cases particularly, court review properly focuses on the time the determination to withhold is made.").

As to the timeliness of an agency's asserted exemption, the "general rule" is that agencies "must assert all exemptions at the same time, in the original district court proceedings." Maydak v. U.S. Dep't of Just., 218 F.3d 760, 764 (D.C. Cir. 2000); Jud. Watch, Inc. v. U.S. Dep't of State, 282 F. Supp. 3d 338, 341 (D.D.C. 2017) (same).  This is because "allowing an agency to invoke new FOIA exemptions on remand – thereby essentially restarting the litigation – could interfere with the FOIA's 'statutory goals of efficient, prompt, and full disclosure of information, and with interests of judicial finality and economy.'"  Elec. Priv. Info. Ctr. v. Dep't of Just., 296 F. Supp. 3d 109, 122 (D.D.C. 2017) (quoting Maydak, 218 F.3d at 764).

"Essentially, <u>Maydak</u> prohibits the government from 'play[ing] cat and mouse by withholding its most powerful cannon until after the District Court has decided the case and then springing it on surprised opponents and the judge.'" <u>Marino v. Drug Enf't Admin.</u>, 2021 WL 3793053, at *5 (D.D.C. Aug. 26, 2021) (quoting <u>Aug. v. FBI</u>, 328 F.3d 697, 699 (D.C. Cir. 2003)).

> Courts have recognized two exceptions to this rule:
>
> (1) "extraordinary circumstances where, from pure human error, the government failed to invoke the correct exemption and will have to release information compromising national security or sensitive, personal, private information unless the court allows it to make an untimely exemption claim"; and (2) "a substantial change in the factual context of the case or an interim development in the applicable law forces the government to invoke an exemption after the original district court proceedings have concluded."

<u>Id.</u>  (quoting <u>Maydak</u>, 218 F.3d at 767); <u>Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.</u>, 823 F.2d 574, 581 (D.C. Cir. 1987) (agency permitted to raise new exemptions on appeal due in part to "special circumstances"); <u>Adamowicz v. I.R.S.</u>, 552 F. Supp. 2d 355, 361 (S.D.N.Y. 2008) (finding that an agency's "failure to raise an exemption prior to an adverse determination does not give rise to waiver").

Plaintiffs have not cited any case suggesting that agencies may not raise new exemptions during the document review and production process, however.  To the contrary,  "the document-production process is a fluid one at the district-court level, and it often includes contemporaneous review and continuous production determinations by agency-defendants." <u>Elec. Priv. Info. Ctr.</u>, 296 F. Supp. 3d at 122.  Agencies are therefore permitted to review their determinations, and, as here, raise new FOIA exemptions as they become applicable prior to the district court's final decision.  <u>See id.</u> ("The Court does not perceive the government as having acted in bad faith, nor does it view the government's filings as providing post-hoc rationalizations for withholdings already made."); <u>see also</u> <u>Heffernan v. Azar</u>, 317 F. Supp. 3d 94, 119 & n.14 (D.D.C. 2018) (exemption permissibly raised in agency's reply brief); <u>Senate of</u>

13

Puerto Rico, 823 F.2d at 581 (Exemption 7(A) properly raised two years after initial FOIA request).

Here, the FBI asserted Exemption 7(A) soon after Epstein's 2019 indictment. (Seidel Decl. (Dkt. No. 50) ¶ 30 & n.4)  While the FBI's invocation of Exemption 7(A) took place after Plaintiff initiated this action in 2017 (Cmplt. (Dkt. No. 1)), it was well before this Court reached "the merits of the parties' initial summary judgment motions, [and well before] . . . any appellate proceedings." Elec. Priv. Info. Ctr., 296 F. Supp. 3d at 122.  Moreover, as discussed below, Plaintiffs have "not been prejudiced in any meaningful sense by the [timing of] the government's assertion of Exemption [7(A)], nor [have Plaintiffs] provided any evidence of bad faith with respect to the government's timing on this issue." Id. (emphasis omitted).  To the contrary, the FBI produced records in response to Plaintiffs FOIA requests for well over a year before Epstein was indicted and the FBI asserted Exemption 7(A).  In other words, the FBI has not raised different exemptions at different times throughout the proceedings in an apparent attempt to gain a "tactical advantage." See Senate of Puerto Rico, 823 F.2d at 581.

Plaintiffs argue, however, that this Court should find the FBI's invocation of Exemption 7(A) to be untimely because (1) "this Court should not permit the assertion of retroactive exemptions"; (2) the cases cited by the FBI are distinguishable; and (3) "the need to limit the changed circumstances doctrine is particularly striking here because the changed circumstance is entirely of the Government's own making."  (Pltf. Br. (Dkt. No. 43) at 13-14) None of these arguments is persuasive.

Plaintiffs complain that "the FBI [improperly] asserted Exemption 7(A) retroactively to cover the first two years of the production in its Motion for Summary Judgment." (See Pltf. Supp. Reply Br. (Dkt. No. 48) at 1-2)  As discussed above, however, the FBI asserted

Exemption 7(A) soon after Epstein was indicted in 2019 and in any case years before the parties' summary judgment briefing was complete.  While government agencies are generally required to assert all applicable FOIA exemptions prior to the district court's ruling on "the merits of the parties' initial summary judgment motions," Elec. Priv. Info. Ctr., 296 F. Supp. 3d at 122, that is exactly what the FBI did here.  Moreover, whether Exemption 7(A) now applies to bar disclosure of the records sought does not depend on the propriety of any previously raised exemptions.[8]

Plaintiffs' attempt to distinguish Senate of Puerto Rico, 823 F.2d 574 – in which the Second Circuit concluded that Exemption 7(A) was properly invoked two years after the initial FOIA request – and similar cases is not persuasive.  Plaintiffs contend that these cases are distinguishable because the exemptions at issue were "available to [the relevant agencies] . . . at the time of the [original FOIA] request."  (Pltf. Br. (Dkt. No. 43) at 12 ("In other words, the [agency's] invocation [of additional exemptions] was justifiable, if belated."))  But in Senate of Puerto Rico, the Second Circuit upheld an Exemption 7(A) assertion made on remand, two years after the original FOIA request, because the "Senate [did not] contend that the DOJ [had] acted irresponsibly, with a purpose to delay, in failing to anticipate the swift course of the federal prosecution in Puerto Rico" that triggered the applicability of Exemption 7(A).  Senate of Puerto Rico, 823 F.2d at 580-81.  Nothing in Senate of Puerto Rico suggests that an agency may not assert an exemption once it becomes applicable during district court proceedings.

Finally, there is no "need to limit the changed circumstances doctrine" here, as Plaintiffs suggest (Pltf. Br. (Dkt. No. 43) at 13), because there is no evidence that the government manipulated the course of events to frustrate Plaintiffs' FOIA request.  As discussed

---

[8]  The FBI may thus assert the applicability of Exemption 7(A) both as to responsive records that the FBI categorically withheld after its July 2019 review, and to records processed before Epstein's indictment, concerning which the FBI subsequently asserted Exemption 7(A) coverage.

above, the "changed circumstances doctrine" is an exception to the general rule that agencies "must assert all exemptions at the same time." Maydak, 218 F.3d at 764. Here, the "changed circumstance" was the 2019 Epstein indictment, which triggered the applicability of Exemption 7(A). (Seidel Decl. (Dkt. No. 50) ¶ 30 & n.4) While it is true that the government controlled the timing of the Epstein indictment, there is no evidence that the FBI delayed or manipulated the production of responsive documents in anticipation of the Epstein indictment, or that the government obtained the Epstein indictment in order to avoid producing documents responsive to Plaintiffs' FOIA request.

Shapiro v. DOJ, 177 F. Supp. 3d 467 (D.D.C. 2016), cited by Plaintiffs (Pltf. Br. (Dkt. No. 43) at 13) is not on point. In that FOIA action, the FBI sought to "advance a new policy that would protect some of [the] records" it had been ordered to produce by the district court at summary judgment. Shapiro, 177 F. Supp. 3d at 469-70. The court concluded that the "changed circumstances" exception did not apply because the FBI "changed its policy . . . [well] before the Court issued its [summary judgment] opinion in this matter. . . . The FBI [did] not point to any 'interim development,' . . . outside its control [that caused it to change its policy]; it only represent[ed] that [it] developed a new policy that it would like to apply to the plaintiffs' requests." Id. The court also commented that the FBI had "not lacked for opportunities to inform the Court or the plaintiffs that it had adopted a new policy," but had not done so. Id. at 470-71. Given these circumstances, the court expressed concern that the FBI's "new policy" might constitute "'an attempt to gain a tactical advantage over the FOIA requester.'" Id. at 470 (quoting Aug., 328 F.3d at 698).

There are no such facts here. The FBI raised Exemption 7(A) soon after Epstein's 2019 indictment, when the exemption became applicable and before any briefing in this case.

And there is no suggestion that the FBI manipulated either its document production or the timing of the Epstein's indictment in "'an attempt to gain a tactical advantage over the FOIA requester.'" Id. (quoting Aug., 328 F.3d at 698).

In sum, the FBI's invocation of Exemption 7(A) was timely.

**C.     Whether Exemption 7(A) Applies**

The FBI contends that Exemption 7(A) applies to "all of the records that were withheld by the FBI in full or in part" (Def. Br. (Dkt. No. 38) at 13), because their "public disclosure . . . could reasonably be expected to interfere with the pending prosecution of [Ghislaine] Maxwell." (2021 Comey Decl. (Dkt. No. 39) ¶ 11)

**1.     Law Enforcement Records**

With respect to the first requirement for application of Exemption 7(A) – whether the requested records were "compiled for law enforcement purposes" 5 U.S.C. § 552(b)(7) – the records withheld by the FBI concern the FBI's "investigation of criminal child prostitution involving Jeffrey Epstein." (Seidel Decl. (Dkt. No. 50) ¶ 55.  Accordingly, the records plainly were "compiled for law enforcement purposes."  See Halpern v. F.B.I., 181 F.3d 279, 296 (2d Cir. 1999) ("[A]ll records of investigations compiled by the FBI are for law enforcement purposes.").

**2.     Pending or Prospective Law Enforcement Proceeding**

As to whether a "law enforcement proceeding is pending or prospective," Maxwell was convicted on December 29, 2021, was sentenced to 20 years' imprisonment on June 28, 2022.  (20 Cr. 330, Dkt. Sheet at Dec. 29, 2021; id. Judgment (Dkt. No. 696))  Maxwell appealed her conviction on July 7, 2022, and the appeal remains pending.  (2023 Comey Decl. (Dkt. No. 47) ¶ 7)

A "law enforcement proceeding" remains "pending or prospective" for purposes of Exemption 7(A) even though the target of such an investigation has been convicted and filed an appeal.  See Kansi v. U.S. Dep't of Just., 11 F. Supp. 2d 42, 44 (D.D.C. 1998) ("The potential for interference with witnesses and highly sensitive evidence that drives the 7(A) exemption exists at least until plaintiff's conviction is final.") (citations omitted); James v. U.S. Secret Serv., 2007 WL 2111034, at *5 (D.D.C. July 23, 2007) ("A pending appeal of a criminal conviction qualifies as an ongoing or prospective law enforcement proceeding for purposes of Exemption 7(A).").

Plaintiffs argue, however, that the FBI has only cited "cases that support the abstract principle that a pending appeal could provide the 'potential' for appropriately utilizing the exemption, [and has not] offer[ed] a logical or plausible justification against release of the records."  (Pltf. Supp. Reply (Dkt. No. 48) at 3)  But Maxwell's "success on appeal . . . is not foreclosed," and accordingly, her prosecution remains "pending" for purposes of Exemption 7(A).  Kidder v. F.B.I., 517 F. Supp. 2d 17, 28 (D.D.C. 2007).

### 3.      Interference with Law Enforcement Proceedings

Prior to the Maxwell trial, the FBI asserted that release of the withheld records (1) would "allow Maxwell earlier or greater access to agency investigatory files than she otherwise would have through the criminal discovery process" (2021 Comey Decl. (Dkt. No. 39) ¶ 13); (2) "could reasonably be expected to influence witnesses' potential testimony at trial" (id. ¶¶ 14, 15-16); (3) "could reasonably be expected to influence potential jurors' perceptions of the witnesses and the evidence to be presented at trial" (id. ¶¶ 14, 17-21); and (4) "would identify the FBI's investigative interest in particular individuals . . . and provide subjects . . . the opportunity to destroy evidence and/or alter their behavior to avoid detection."  (Id. ¶ 22)  The FBI further

asserted that disclosure of the records to the media carried a greater than ordinary risk of tainting

jury impartiality and witness testimony, given the "heightened . . . media coverage of

[Maxwell's] prosecution."  (Id. ¶ 14)

Because Maxwell's appeal remains pending, the FBI maintains that these same

risks still exist.  (See 2023 Comey Decl. (Dkt. No. 47) ¶ 8 ("Given that the Maxwell criminal

prosecution is still pending on appeal, and if the Second Circuit grants Maxwell the relief she

seeks, there could be a new trial, [and] public disclosure of the FBI's records relating to the

investigation and prosecution of Epstein would still likely interfere with the prosecution of

Maxwell, for similar reasons as explained in [the] June 2021 [Comey] declaration."); Def. Supp.

Br. (Dkt. No. 46) at 4-5 ("[P]ublic disclosure of the FBI's records relating to the investigation

and prosecution of Epstein would still reasonably be expected to interfere with the prosecution of

Maxwell[, because Maxwell seeks a new trial on appeal].""))

Plaintiffs argue that the "FBI's supporting declarations do not offer sufficient

detail . . . [and] merely summarize what types of documents exist within Epstein's FBI file

without specifically demonstrating how they could harm the specific law enforcement case at

issue."  (Pltf. Br. (Dkt. No. 43) at 15-16)  Plaintiffs further contend that the Comey declarations

contain only "conclusory justifications of harm . . . [that] do not withstand scrutiny."  (Id. at 16)

> "[U]nder exemption 7(A) the government is not required to make a specific
> factual showing with respect to each withheld document that disclosure would
> actually interfere with a particular enforcement proceeding.  Rather, federal courts
> may make generic determinations that, with respect to particular kinds of
> enforcement proceedings, disclosure of particular kinds of investigatory records
> while a case is pending would generally interfere with enforcement proceedings."

Radcliffe v. I.R.S., 536 F. Supp. 2d 423, 437 (S.D.N.Y. 2008), aff'd, 328 F. App'x 699 (2d Cir.

2009) (quoting Barney v. I.R.S., 618 F.2d 1268,1273 (8th Cir.1980)).  "Because generic

determinations are permitted, the government need not justify its withholdings document-by-

document; it may instead do so category-of-document by category-of-document.  The

government may not, however, make its justifications file-by-file."  Crooker v. Bureau of

Alcohol, Tobacco & Firearms, 789 F.2d 64, 67 (D.C. Cir. 1986) ("Congress did not authorize [a]

'blanket exemption' for 'all records relating to an ongoing investigation.'") (quoting Campbell v.

Department of Health and Human Services, 682 F.2d 256 (D.C. Cir.1982)); CREW I, 746 F.3d at

1098 ("[A]n agency may satisfy its burden of proof 'by grouping documents in categories and

offering generic reasons for withholding the documents in each category.'") (quoting Maydak,

218 F.3d at 765).

> "[I]f [an agency] wishes to adopt the generic approach, [it] has a three-fold task.
> First, it must define its categories functionally.  Second, it must conduct a
> document-by-document review in order to assign documents to the proper
> category.  Finally, it must explain to the court how the release of each category
> would interfere with enforcement proceedings."

CREW I, 746 F.3d at 1098 (quoting Bevis v. Dep't of State, 801 F.2d 1386, 1389-90 (D.C. Cir.

1986)).

While appearing to adopt a "category-of-document by category-of-document"

approach, the FBI in fact argues that Exemption 7(A) applies to the withheld records on an

impermissible "file-by-file" basis.

The 2021 Comey Declaration groups the responsive records sought by Plaintiffs

and withheld by the FBI into three categories:  (1) "[i]nterview forms, reports and notes . . . of

interviews with individuals, including victims"; (2) "Federal Grand Jury Subpoenas and

Subpoenaed information"; and (3) other records including "documents provided by state and

local law enforcement agencies, . . . . background information for witnesses  . . . and subjects for

the investigation[,] communications within the FBI [and between the FBI and other agencies]

regarding the investigation[,] organizational documents, . . . the sources from and techniques

through which such information and evidence was gathered[,]  . . . the methods used to analyze

the information and evidence, . . . and the focus of the investigation."  (2021 Comey Decl. (Dkt. No. 39) ¶ 11)

The Seidel declaration organizes the responsive documents differently, however, listing nine "types of responsive records"[9] and three "functional categories of information": (1) "Evidentiary/Investigative Materials," including "confidential witness statements" and "information exchanged between the FBI and its local law enforcement partners"; (2) "Administrative materials," including internal agency "reporting communications" pertaining to an investigation, and other "standardized forms used for a variety of purposes"; and (3) "public source material," including news articles and court transcripts which have already been "released . . . to Plaintiffs."  (Seidel Decl. (Dkt. No. 50) ¶¶ 58-68 (capitalization altered) The document categories in the Seidel declaration and in the 2021 Comey declaration do not match, and documents falling within each of the Comey categories likely span multiple categories described by Seidel.

In any event, the FBI has not explicitly linked any of the document categories – whether Seidel's or Comey's – to the four types of potential harm cited in the 2021 Comey declaration – (1) "allow[ing] Maxwell earlier or greater access to agency investigatory files than she otherwise would have through the criminal discovery process"; (2) "influenc[ing] witnesses' potential testimony at trial"; (3) "influenc[ing] potential juror's perceptions of the witnesses and the evidence to be presented at trial"; and  (4) "identify[ing] the FBI's investigative interest in

---

[9]  (1) "FD-1057 - Electronic Communication"; (2) "Interview Forms (FD-302)"; (3) "Handwritten Interview Notes"; (4) "State and Local Law Enforcement Documents"; (5) "Documents Implementing Sensitive Investigative Techniques"; (6) "Federal Grand Jury Subpoenas/Subpoenaed Information"; (7) "FD-340, IA Envelopes"; (8) "Other Investigative Documents"; and (9) "Internet Printouts."  (Seidel Decl. (Dkt. No. 50) ¶¶ 58-68 (formatting altered))

particular individuals . . . and [thus] provid[ing] subjects [with] . . . the opportunity to destroy evidence and/or alter their behavior to avoid detection."  (2021 Comey Decl. (Dkt. No. 39) ¶¶ 13-22)

    The FBI instead merely asserts that "disclosure of the records" in general would "interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  As to Maxwell obtaining "earlier or greater access to agency investigatory files than she otherwise would have," the FBI links that harm to "the entirety of the records at issue in this litigation."  (2021 Comey Decl. (Dkt. No. 39) ¶ 13)  Likewise, the FBI's concern that "[p]remature disclosure of the records withheld under Exemption 7(A) . . . could reasonably be expected to impair the Government's (and the defendant's) ability to seat a fair and impartial jury in <u>Maxwell</u>" is not tied to any clearly identified functional category of investigatory records.[10]  (2021 Comey Decl. (Dkt. No.

---

[10]  Moreover, the FBI's concerns regarding the effects of disclosure on jury impartiality are properly raised under Exemption 7(B), and not under Exemption 7(A).  Exemption 7(A) applies to records "compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  There is a separate exemption for records the disclosure of which "would deprive a person of a right to a fair trial or an impartial adjudication."  <u>Id.</u> § 552(b)(7)(B).  The FBI has not argued that Exemption 7(B) applies to any of the records withheld here, however.  (<u>See generally</u> Def. Br. (Dkt. No. 38))  Nor has the FBI identified any case holding that Exemption 7(A) applies to records the disclosure of "which could impair the . . . ability to seat a fair and impartial jury" (2021 Comey Decl. (Dkt. No. 39) ¶ 17) – and this Court has not discovered any such case.

As the D.C. Circuit recently noted, "Exemption 7(B) applies only when the disclosure of law enforcement records would deprive a person of the right to 'a fair trial or an impartial adjudication[]' . . . [and] the word 'trial' means the ultimate determination of factual and legal claims by judge or jury in a judicial proceeding."  <u>Chiquita Brands Int'l Inc. v. S.E.C.</u>, 805 F.3d 289, 295 (D.C. Cir. 2015) (quoting 5 U.S.C. § 552(b)(7)(B)); <u>see also</u> <u>Washington Post Co. v. U.S. Dep't of Just.</u>, 863 F.2d 96, 101 (D.C. Cir. 1988)  ("The exemption[] . . . was meant to prevent disclosures from conferring an unfair advantage upon one party to an adversary proceeding or leading to prejudicial publicity in pending cases that might inflame jurors or distort administrative judgment.").  "Congress made the threshold of (7)(B) higher than for [7(A)] . . . .  Whereas (7)(A), (C), (D) and (F) permit records to be withheld if release 'could

39) ¶¶ 17-19; see also Def. Br. (Dkt. No. 38) at 18 (asserting that "the release of these categories

of records could reasonably be expected to impair the ability to seat a fair and impartial jury in

the Maxwell trial" without identifying any such categories))

As to interference with witness testimony, the FBI asserts that the withheld

records include

> information about which witnesses may be expected to testify at trial, [] details
> that are not publicly known or known to other witnesses, and [] information and
> documents authored by potential trial witnesses. These records also include
> potential trial exhibits that the Government anticipates will be entered into
> evidence, many of which the potential trial witnesses have not seen.

(2021 Comey Decl. (Dkt. No. 39) ¶ 15)

The FBI cites N.L.R.B. v. Robbins Tire & Rubber Co., 437 U.S. 214, 224 (1978)

to argue that "Exemption 7(A) was enacted precisely to prevent such an end run around the rules

governing criminal discovery." (See Def. Br. (Dkt. No. 38) 17) That case concerns an

employer's request, "pursuant to FOIA, that [the National Labor Relations Board] make

available for inspection and copying, at least seven days prior to [a] hearing [concerning the

employer's labor practices], copies of all potential witnesses' statements collected during the

---

reasonably be expected to' cause a particular evil, (7)(B) requires that release 'would' deprive a
person of fair adjudication." Washington Post Co., 863 F.2d at 102 (quoting 5 U.S.C. § 552(b)).

It appears unlikely that Congress intended that Exemption 7(A) apply to documents "which
could reasonably be expected to impair the . . . ability to seat a fair and impartial jury." (2021
Comey Decl. (Dkt. No. 39) ¶ 23) That reading of Exemption 7(A) would swallow Exemption
7(B), despite the latter's heightened standard and distinct requirements. See U.S. DOJ v. Reps.
Comm. For Freedom of Press, 489 U.S. 749, 776 (1989) ("[T]he language of Exemptions 7(B),
(C), and (D) seems to contemplate a case-by-case [analysis whereas] . . . Exemption 7(A)
'appears to contemplate that certain generic determinations might be made.'") (quoting Robbins
Tire, 437 U.S. at 223–24).

In any event, the parties have not briefed the applicability of Exemption 7(B) and – despite the
reference to the "ability to seat a fair and impartial jury" in the Comey declarations – the Court
does not understand the FBI to be claiming that Exemption 7(B) applies here.

Board's investigation." <u>Robbins Tire</u>, 437 U.S. at 216.  The Court declined to read FOIA as "overrid[ing] a long tradition of [relatively limited] agency discovery" in the "absence of clear congressional direction." <u>Id.</u> at 238-239.  The Court also noted, however, that "[t]he most obvious risk of 'interference' with enforcement proceedings . . . is that employers or, in some cases, unions will coerce or intimidate employees and others who have given statements, in an effort to make them change their testimony or not testify at all." <u>Id.</u> at 239.  Accordingly, the Court's holding in favor of the agency was premised on the danger of "disclosure of [a] particular kind[] of investigatory record[]," <u>i.e.</u>, witness statements, <u>id.</u> at 236, and not on concerns over disclosure of "the entirety of the records at issue" (2021 Comey Decl. (Dkt. No. 39) ¶ 13) – here, more than 10,000 pages of records.[11]  (Seidel Decl. (Dkt. No. 50) ¶ 3)

In sum, the FBI has not demonstrated that the "disclosure of particular kinds of investigatory records," <u>Robbins Tire</u>, 437 U.S. at 236, would interfere with any retrial of Maxwell if she were to prevail on appeal.  Accordingly, the FBI's motion for summary judgment will be denied to the extent it is predicated on Exemption 7(A).  <u>See</u> <u>CREW I</u>, 746 F.3d at 1099 ("[A]lthough the DOJ identifies [] distinct categories of documents[,] . . . it never explains how the specific risks entailed in premature disclosure of one category of document might differ from risk of disclosure of the other."); <u>Campbell v. Dep't of Health & Hum. Servs.</u>, 682 F.2d 256, 263-64 (D.C. Cir. 1982) ("If . . . an active investigation [alone] . . . constituted a sufficient

---

[11]  While the Seidel Declaration discusses certain harm that could flow from the disclosure of certain categories of documents (Seidel Decl. (Dkt. No. 50) ¶¶ 59-68), the FBI has not argued that the Seidel Declaration sufficiently supports withholding the records, and the Bureau does not rely on the Seidel Declaration in arguing that "disclosure of the records [at issue] would interfere with pending criminal proceedings."  (Def. Br. (Dkt. No. 38) at 16-18 (capitalization altered); <u>see also</u> Def. Reply (Dkt. No. 41) at 10-13; Def. Supp. Br. (Dkt. No. 46) at 2-9)  The FBI's briefing instead tracks the various harms cited in the 2021 Comey declaration, without linking those harms to any particular category of documents.

predicate for the invocation of Exemption 7(A), the Court in <u>Robbins Tire</u> would not have

examined the special risks entailed in premature disclosure of . . . a particular kind of records. . . .

Instead, the Court would simply have held those statements clearly related to a concrete

enforcement matter and, . . . [therefore,] properly withheld."); <u>Prop. of the People, Inc. v. DOJ</u>,

2021 WL 3052033, at *3 (D.D.C. July 20, 2021) (holding that an agency's withholding of

documents at the file level was inadequate).

## III.   <u>EXEMPTION 3</u>

Exemption 3 allows an agency to withhold records that are "specifically exempted

from disclosure by statute."  5 U.S.C. § 552(b)(3).  "To claim this Exemption, the government

must demonstrate that:  '(1) the statute invoked qualifies as an [E]xemption 3 withholding

statute, and (2) the materials withheld fall within that statute's scope.'"  <u>Spadaro v. U.S. Customs</u>

<u>& Border Protection</u>, 978 F.3d 34, 42 (2d Cir. 2020) (quoting <u>A. Michael's Piano, Inc. v. FTC</u>,

18 F.3d 138, 143 (2d Cir. 1994)).

Here, the FBI relies on three statutes that preclude disclosure of certain

documents sought by Plaintiffs:  (1) the Child Victims' and Child Witnesses' Rights Act, 18

USC. § 3509; (2) Fed. R. Crim. P. 6(e)'s shield of "matters occurring before the grand jury"; and

(3) the Juvenile Justice and Delinquency Act, 18 U.S.C. § 5038.  (Seidel Decl. (Dkt. No. 50)

¶¶ 48-51)  Plaintiffs "do not contest" that these statutes qualify as Exemption 3 withholding

statutes, but they argue that "the FBI fails to identify how it employed these exemptions and to

what degree," and that the Seidel declaration does not "establish that the records were reviewed

for segregable, non-exempt material."  (Pltf. Br. (Dkt. No. 43) at 23)

### A.    <u>Child Victims Information</u>

As Plaintiffs acknowledge, "the Child Victims' Act unambiguously qualifies as

an Exemption 3 statute."  <u>Corley v. Dep't of Just.</u>, 998 F.3d 981, 985 (D.C. Cir. 2021).[12]  (Pltf.

Br. (Dkt. No. 43) at 23)  The Seidel declaration states that the FBI asserted Exemption 3 as to

certain of the withheld records "to protect names, images, and identifying information of minor

children victims and witnesses within the child prostitution investigation of Jeffrey Epstein."

(Seidel Decl. (Dkt. No. 50) ¶ 49)  Plaintiffs have not offered any basis to believe that the FBI's

justification is insufficient.  The Court therefore concludes that the FBI properly withheld

material pursuant to the Child Victims' Act.  <u>See</u> <u>Vaskas v. DHS</u>, 2023 WL 4930092, at *2

(D.D.C. Aug. 2, 2023) ("Defendants' declaration establishes that some of their records . . .

included statutorily protected information about children, regardless of whether [Plaintiff]

specifically requested that information.  That is sufficient to withhold those records.").

### B.    <u>Grand Jury Materials</u>

Federal Rule of Criminal Procedure 6(e) prohibits government attorneys, grand

jurors, and others from "'disclos[ing] a matter occurring before the grand jury,' . . . and, although

---

[12]  The Child Victim's Act provides that "all employees of the Government connected with [a particular] case" "shall (i) keep all documents that disclose the name or any other information concerning a child in a secure place to which no person who does not have reason to know their contents has access; and (ii) disclose documents described in clause (i) or the information in them that concerns a child only to persons who, by reason of their participation in the proceeding, have reason to know such information."  18 U.S.C. § 3509(d).  "This two-part requirement, that documents 'shall' be kept 'in a secure place' and disclosed 'only' to authorized personnel (as opposed to the general public), clearly 'requires that . . . matters be withheld from the public in such a manner as to leave no discretion on the issue.'"  <u>Corley</u>, 998 F.3d at 985 (quoting 5 U.S.C. § 552(b)(3)(A)(i)).

a rule is not generally considered to be a statute, it qualifies as one under FOIA [and Exemption 3,] because the Congress has enacted it into positive law." Murphy v. Exec. Off. for U.S. Att'ys, 789 F.3d 204, 206 (D.C. Cir. 2015) (quoting Fed. R. Crim. P. 6(e)). Rule 6(e) and Exemption 3 apply where responsive documents would "'tend to reveal some secret aspect of the grand jury's investigation,' including 'the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation,' or 'the deliberations or questions of jurors.'" Hodge v. F.B.I., 703 F.3d 575, 580 (D.C. Cir. 2013) (quoting Senate of Puerto Rico, 823 F.2d at 582). "The disclosure of information 'coincidentally before the grand jury [which can] be revealed in such a manner that its revelation would not elucidate the inner workings of the grand jury' is not prohibited." Senate of Puerto Rico, 823 F.2d at 582 (quoting Fund for Constitutional Government v. National Archives and Records Service, 656 F.2d 856, 870 (D.C.Cir.1981)).

Here, the Seidel declaration asserts that certain records responsive to Plaintiffs' request address or detail "matters occurring before one or more federal grand juries empaneled in relation to the investigations at issue." (Seidel Decl. (Dkt. No. 50) ¶ 50) In particular, responsive records contain "names of recipients of federal grand jury subpoenas"; "information that identifies specific records subpoenaed by a federal grand jury"; and "copies of specific records provided pursuant to federal grand jury subpoenas." (Id.)

Plaintiffs complain that the Seidel declaration fails "to show a 'nexus between disclosure and revelation of a protected aspect of the grand jury's investigation.'" (Pltf. Br. (Dkt. No. 43) at 23-24 (quoting Senate of Puerto Rico, 823 F.2d at 584))

There is support for the FBI's argument that "information about the names of recipients of federal grand jury subpoenas[ and] . . . that identifies specific records subpoenaed by a federal grand jury" (Seidel Decl. (Dkt. No. 50) ¶ 50) would "tend to reveal some secret

aspect of the grand jury's investigation."  Senate of Puerto Rico, 823 F.2d at 582 (internal

quotation marks omitted).  The D.C. Circuit has rejected the argument that "copies of specific

records provided to a federal grand jury" are automatically exempt from disclosure, however.

See Labow v. United States Dep't of Just. ("Labow II"), 831 F.3d 523, 529 (D.C. Cir. 2016)

(vacating in part and remanding).

    In Labow, the D.C. Circuit criticized the district court for failing to provide an

"explanation" in support of its conclusion that "releasing [such] documents would 'reveal the

strategy or direction of the [grand jury's] investigation.'"  Id. (quoting Labow v. U.S. Dep't of

Just. ("Labow I"), 66 F. Supp. 3d 104, 121 (D.D.C. 2014))  Here, as in Labow, Plaintiffs "did not

request documents related to a grand jury" and it is the "government [that has] revealed the

existence of a grand jury by withholding the documents."  Id.; compare id. ("It is possible that,

had the government released the documents without invoking Exemption 3, [plaintiff] would

never have known that any of the documents had been subpoenaed by a grand jury."); with

Boehm v. Fed. Bureau of Investigation, 983 F. Supp. 2d 154, 159 (D.D.C. 2013) ("[P]laintiff

seeks these documents to learn what occurred before the grand jury, not for use in furtherance of

a lawful investigation.")  Moreover, the FBI has not explained or provided details regarding its

conclusory assertion that "[a]ny disclosure of this information would clearly violate the secrecy

of the grand jury proceedings and could reveal the inner workings of a federal grand jury."

(Seidel Decl. (Dkt. No. 50) ¶ 50).  See also Labow II, 831 F.3d at 530 (describing the same

justification as "conclusory"); see id. ("[W]e do not know why documents obtained through the

grand jury's subpoenas would necessarily reveal" the "inner workings of a federal grand jury.")

(emphasis in original).

The Second Circuit has followed the D.C. Circuit's analysis in applying

Exemption 3 to Rule 6(e) materials:

> Documents requested under the FOIA may be withheld under Rule 6(e) only when their "disclosure would tend to reveal some secret aspect of the grand jury's investigation . . . [i.e.,] identities of witnesses or jurors, . . . [and] the strategy or direction of the investigation." . . . The government defendants have simply failed to demonstrate "a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." A document that is otherwise available to the public does not become confidential simply because it is before a grand jury. Instead, there must be a showing that disclosure of the document will result in exposure of some other aspect of the grand jury proceeding that is secret. No such showing has been made in the instant case. Indeed, the subject matter of the investigation was sufficiently known to have prompted the FOIA request.

John Doe Corp. v. John Doe Agency, 850 F.2d 105, 109 (2d Cir. 1988), rev'd on other grounds,

493 U.S. 146 (1989) (quoting Senate of Puerto Rico, 823 F.2d at 582, 584).

In Grynberg v. DOJ, plaintiff "sought . . . bank records, court transcripts, and

corporate records received from subpoenas directed at [third parties] . . . in the course of [a

government investigation]." 758 F. App'x 162, 163 (2d Cir. 2019) (summary order). The

Second Circuit found adequate an agency's declaration that the disclosure of such materials

"would publicly reveal the scope and secret aspects of the grand jury investigation by showing

where the Government sought its evidence, the sources of information it had relied on to develop

the facts of its investigation, and the steps that the Government anticipated taking and actually

took in furtherance of the investigation," and "make clear who produced them and show what

criminal actions were being investigated." Id. at 164. The Second Circuit concluded that the

declaration "establishe[d] an ample 'nexus between disclosure and revelation of a protected

aspect of the grand jury's investigation.'" Id. (quoting John Doe Corp., 850 F.2d at 109); see

also Sorin v. DOJ, 758 F. App'x 28, 31 (2d Cir. 2018) ("(1) communications from a law firm to

federal prosecutors, accompanying the production of documents requested by grand jury

subpoena and discussing the contents of specific subpoenas; and (2) communications from those

federal prosecutors to that law firm referencing specific grand jury subpoenas . . . 'tend to reveal what transpired before' the grand jury.") (quoting United States v. E. Air Lines, Inc., 923 F.2d 241, 244 (2d Cir. 1991)).

In sum, "copies of specific records provided to a federal grand jury" are not exempt from disclosure under FOIA merely because "the documents were subpoenaed."  Id. Because the FBI has not separately categorized records withheld pursuant to Rule 6(e), the Court cannot determine which categories of records, if any, are properly exempt under Exemption 3 and pursuant to Rule 6(e).  See Lopez v. DOJ, 393 F.3d 1345, 1349 (D.C. Cir. 2005) (discussing different categories of grand jury materials requested pursuant to FOIA).  Accordingly, the FBI has failed to meet its burden with respect to grand jury materials under Exemption 3.

## C.   Juvenile Arrest and Criminal History Information

The FBI asserts that it properly withheld records "that contain arrest information and criminal history of third party juveniles" pursuant to the Juvenile Justice and Delinquency Act (the "Delinquency Act").  (Def. Br. (Dkt. No. 38) at 22)  The FBI has not argued – or cited to any case law holding – that the Delinquency Act "'qualifies as an [E]xemption 3 withholding statute.'"  Spadaro, 978 F.3d at 42 (quoting A. Michael's Piano, Inc., 18 F.3d at 143).  Assuming arguendo that the Delinquency Act qualifies as an Exemption 3 withholding statute, the FBI has not met its burden to show that "'the materials withheld fall within that statute's scope.'"  Id. (quoting A. Michael's Piano, Inc., 18 F.3d at 143); A. Michael's Piano, Inc., 18 F.3d at 143 ("The burden of proof, upon such review, rests with the agency asserting the exemption, with doubts resolved in favor of disclosure.").

The Delinquency Act provides that "[t]hroughout and upon the completion of [] juvenile delinquency proceeding[s], the records [regarding these proceedings] shall be

safeguarded from disclosure to unauthorized persons."  18 U.S.C. § 5038(a).  The Delinquency

Act defines a "juvenile delinquency" as a "violation of a law of the United States committed by a

person prior to his eighteenth birthday which would have been a crime if committed by an

adult."  18 U.S.C. § 5031; see also id. § 5032 (establishing procedures for delinquency

proceedings in federal district court).  "Read in the context of these sections, the phrase 'juvenile

delinquency proceeding' in section 5038(a) is clearly a reference to a federal delinquency

proceeding."  McDonnell v. United States, 4 F.3d 1227, 1249 (3d Cir. 1993).

       The FBI does not state whether there are responsive documents that concern

federal juvenile proceedings.  (See Seidel Decl. (Dkt. No. 50) ¶ 51)  Accordingly, even assuming

that the Delinquency Act qualifies as an Exemption 3 withholding statute, this Court is not in any

position to determine whether responsive records fall within the scope of the Delinquency Act.

See McDonnell, 4 F.3d at 1249. ("Because Rogers' juvenile records are state juvenile records,

they do not fall within the scope of § 5038.").[13]

## IV.  **EXEMPTION 5**

       Exemption 5 protects from disclosure records consisting of "inter-agency or intra-

agency memorandums or letters that would not be available by law to a party other than an

agency in litigation with the agency, provided that the deliberative process privilege shall not

apply to records created 25 years or more before the date on which the records were requested."

---

[13]  The FBI states that it "also asserted Exemptions 6 and 7(C) over all information [withheld pursuant to the Delinquency Act]."  (Seidel Decl. (Dkt. No. 50) ¶ 51)  As discussed below, the Court concludes that the FBI has met its burden as to Exemptions 6 and 7(C) to the extent that the it seeks to withhold "names and identifying information" of eight categories of people, including "third party victims" of Epstein's crimes.  (Id. ¶¶ 73-83)  Accordingly, any "names and identifying information" contained within the relevant juvenile delinquency records are protected from disclosure under Exemptions 6 and 7(C), but the entirety of these records is not protected under these provisions.

5 U.S.C. § 552(b)(5).  "To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).  "'Courts have interpreted Exemption 5 to encompass traditional common-law privileges against disclosure, including the work-product doctrine and  . . . deliberative process and attorney-client privileges."  ACLU v. U.S. DOJ, 210 F. Supp. 3d 467, 476 (S.D.N.Y. 2016) (quoting Nat'l Council of La Raza v. U.S. DOJ, 411 F.3d 350, 356 (2d Cir.2005)).

  "'The work-product doctrine shields materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.""'" McKinley v. Bd. of Governors of Fed. Rsrv. Sys., 647 F.3d 331, 341 (D.C. Cir. 2011) (quoting Judicial Watch, Inc. v. U.S. DOJ, 432 F.3d 366, 369 (D.C. Cir. 2005)) (quoting in turn Fed. R. Civ. P. 26(b)(3)).

  The FBI contends that the following documents are protected by the attorney work-product privilege:

> (i) two internal FBI memoranda which relay information provided by an AUSA relating to the timing of Epstein's indictment and information being gathered or gathered by the FBI, pursuant to the instruction of an AUSA, for the purpose of assessing a potential forfeiture action to seize Epstein's assets; (ii) one memorandum from an FBI investigator to an AUSA, relating to the value of an asset owned by Epstein for consideration of its seizure, with attachments providing supporting information gathered by the FBI regarding the value of the asset; (iii) an internal FBI memorandum that describes actions being taken by the FBI, at the direction of an AUSA, to gather evidence in support of a potential forfeiture action regarding certain of Epstein's assets; (iv) an internal FBI memorandum that describes actions being taken by the FBI, at the direction an AUSA, to gather evidence for the potential prosecution of Epstein and others and seizure of an asset.

(Seidel Decl. (Dkt. No. 50) ¶ 54)

The FBI asserts that these "memoranda were created at the request of an AUSA in reasonable anticipation of litigation, and they provide the AUSA's prosecutorial strategy and the information the AUSA was gathering to either support an indictment of Jeffrey Epstein or a civil forfeiture action."  (Id.)  Plaintiffs do not contest the FBI's description of the memoranda, and do not discuss the work-product privilege.  Plaintiffs instead address the deliberative process privilege, which the FBI has not asserted.  (See Pltf. Br. (Dkt. No. 43) at 24-25 ("[T]he deliberative process privilege 'does not operate indiscriminately to shield all decision-making by public officials.'") (quoting New York Times Co. v. DOD, 499 F. Supp. 2d 501, 514 (S.D.N.Y. 2007)))

Because the memoranda listed by the FBI were prepared in anticipation of litigation against Jeffrey Epstein, they are exempt from disclosure under FOIA.  See Shapiro v. DOJ, 969 F. Supp. 2d 18, 29 (D.D.C. 2013) ("'[A]ny part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5.'") (quoting Tax Analysts v. IRS, 117 F.3d 607, 620 (D.C. Cir.1997)).

## V.  **EXEMPTIONS 6 AND 7(C)**

The FBI has also invoked FOIA Exemptions 6 and 7(C) to withhold information in certain responsive records.  Exemption 6 provides that "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy" are exempt from disclosure.  5 U.S.C. § 552(b)(6).  As discussed above, Exemption 7 protects from disclosure certain "records or information compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).   Plaintiffs do not dispute that the records they seek were compiled for law enforcement purposes.  Subpart (C) applies "only to the extent that the

production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."   Id.

"When information is claimed to be exempt from disclosure under both [Exemption 6 and Exemption 7(C)], courts 'focus . . . on Exemption 7(C) because it provides broader privacy protection than Exemption 6 and thus establishes a lower bar for withholding material.'"   Citizens for Resp. & Ethics in Washington v. DOJ ("CREW II"), 854 F.3d 675, 681 (D.C. Cir. 2017) (quoting CREW I, 746 F.3d at 1091).

Where an "agency identifies a privacy interest in the requested documents," the documents should be disclosed only if "the requester '[] show[s] that the [countervailing] public interest sought to be advanced is a significant one,'" and outweighs the privacy interest.  Behar v. United States Dep't of Homeland Sec., 39 F.4th 81, 91 (2d Cir. 2022) (quoting NARA v. Favish, 541 U.S. 157, 172 (2004)).  The public interest at stake must be "'more specific than having the information for its own sake,'" and the information sought must be "'likely to advance that interest.'"   Id. (quoting Favish, 541 U.S. at 172).  "'[G]oals other than opening agency action to public scrutiny are deemed unfit to be accommodated under FOIA when they clash with privacy rights.'"   Id. (quoting Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 293 (2d Cir. 2009)).  "Thus, 'whether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny.'"   Id. (quoting DOJ v. Reps. Comm. For Freedom of Press, 489 U.S. 749, 772 (1989)).

The FBI asserts that Exemption 7(C) protects from disclosure the "names and identifying information" of eight categories of people:  (1) "third parties who were of investigative interest to the FBI"; (2) "FBI Special Agents [] and Victim Specialists . . .

responsible for conducting, supervising, and/or maintaining the investigation/investigative activities"; (3) "third-party victims"; (4) "local law enforcement employees"; (5) "third parties who were merely mentioned in the investigative records responsive to Plaintiffs' request"; (6) "personnel from non-FBI, federal government agencies who provided information to or otherwise assisted the FBI in its investigation of Jeffrey Epstein"; (7) "local government personnel"; and (8) "individuals who were interviewed, and/or provided information by other means, to the FBI during the course of its investigation of Jeffrey Epstein." (Seidel Decl. (Dkt. No. 50) ¶¶ 73-83) The FBI argues that an individual who falls within these categories has "strong privacy interests . . . 'in preventing dissemination of his or her name and home address'" that are protected by Exemption 7(C). (Def. Br. (Dkt. No. 38) at 25-26 (quoting Federal Labor Relations Auth. v. U.S. Dep't of Veterans Affairs, 958 F.2d 503, 510 (2d Cir. 1992)))

Plaintiffs respond that they "recognize the appropriateness of redacting the names of uninvolved third-parties or juvenile victims who have not come forward." But Plaintiffs argue that the FBI has improperly taken a "categorical approach" to Exemption 7(C) and that – in balancing the relevant interests – it has ignored the "diminished privacy of certain individuals and the immense public interest underlying this case." (Pltf. Br. (Dkt. No. 43) at 20-23)

Plaintiffs complain that "the FBI applied [the] privacy [exemptions] far more expansively than necessary to merely protect the identities of third parties." (Id. at 20) According to Plaintiffs, while

> FOIA allows for the redaction of the names and identifying information of private citizens mentioned in law enforcement files, "it does not permit an agency to exempt from disclosure all material in an investigatory record solely on the grounds that the record includes some information which identifies a private citizen or provides that person's name and address."

(Id. (quoting CREW I, 746 F.3d at 1094)) But the Seidel declaration states that the FBI withheld the "names and identifying information" of eight specific categories of people

throughout the records (Seidel Decl. (Dkt. No. 50) ¶¶ 73-83), not that it withheld "every responsive document in toto." CREW I, 746 F.3d at 1094.  Moreover, the Seidel declaration and the Vaughn index reveal that hundreds of pages of records for which the FBI has asserted Exemptions 6 and 7(C) were "released in part" to Plaintiffs.  (See generally Vaughn index (Dkt. No. 50-31))  And Plaintiffs have not identified any individual records listed in the Vaughn index that the FBI improperly withheld in their entirety based on Exemptions 6 and 7(C).[14]

Plaintiffs also argue that "the FBI offers no information whatsoever as to how individuals' privacy interests were weighed against the substantial public interest in this matter." (Pltf. Br. (Dkt. No. 43) at 20)  Where Exemption 7(C) has been invoked, however, the government agency must "account for the privacy interests at stake," while it is Plaintiffs' "burden to 'show the information [withheld as private under Exemption 7(C)] is likely to advance' the public interest in learning whether [a government agency] pulled its punches." CREW II, 854 F.3d at 683 (quoting Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 172 (2004)).

As to the FBI's balancing of the relevant interests, Plaintiffs do not dispute that the eight categories of individuals listed by the FBI have cognizable privacy interests in their

---

[14]  To the extent that the Plaintiffs' complaint with respect to the FBI's "categorical" approach is that the Bureau has not properly weighed the relevant privacy interests against the public interest in disclosure for each individual record, that complaint is unavailing.  There are more than 10,000 pages of records at issue in this case; reviewing each individual redaction, page, or record would "actually impede court review and undermine the functions served by a Vaughn index." Jud. Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 147 (D.C. Cir. 2006) ("Especially where the agency has disclosed and withheld a large number of documents, categorization and repetition provide efficient vehicles by which a court can review withholdings that implicate the same exemption for similar reasons.").  The FBI's categorization of the types of individual names and identifying information found in the records and withheld is thus appropriate under the circumstances.

names and identities under Exemption 7(C).  See Levy v. U.S. Postal Serv., 567 F. Supp. 2d 162, 167 (D.D.C. 2008) ("Suspects, witnesses, and investigators all have substantial privacy interests that are implicated by the public release of law enforcement investigative materials."); Summers v. United States Dep't of Just., 2004 WL 7333532, at *6 (D.D.C. Apr. 14, 2004) ("The privacy interest is very strong with respect to disclosure of identities of third-party individuals in law enforcement documents.").  That interest is heightened "[i]n the context of this high profile criminal investigation" involving Epstein and Maxwell.  Summers, 2004 WL 7333532, at *6.

The "weighty" public interest in ensuring "the diligence of the FBI's investigation" concerning Epstein and Maxwell notwithstanding, CREW I, 746 F.3d at 1093, the privacy interest of "witnesses and third parties" outweighs the public interest in disclosure to the extent that "names . . . [and] identifying characteristics, [should] properly [be] redacted." Perlman v. U.S. Dep't of Just., 312 F.3d 100, 106 (2d Cir. 2002), vacated on other grounds, 541 U.S. 970 (2004).  Indeed, the D.C. Circuit has held "categorically" that "unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."  SafeCard Servs., Inc. v. S.E.C., 926 F.2d 1197, 1206 (D.C. Cir. 1991).  Plaintiffs have not argued that the FBI has engaged in "illegal activity" here.

The Court concludes that disclosure of the names and identifying information of government employees, victims, witnesses, arrestees, or informants here "would not advance the public's understanding of the [FBI's] performance of its statutory duties."  Behar, 39 F.4th at 94 (internal quotation marks omitted).

Plaintiffs argue, however, that several individuals "have already been publicly connected to the [Epstein/Maxwell trafficking investigation and criminal cases and] controversy or have voluntarily identified themselves," undermining the applicability of Exemption 7(C) as to them.  In this regard, Plaintiffs cite (1) certain individuals "explicitly named in [Epstein's 2007] plea document as receiving immunity"; (2) several alleged victims of Epstein and Maxwell's scheme; and (3) a former attorney for Epstein, Alan Dershowitz.  (Pltf. Br. (Dkt. No. 43) at 20-22)

The "SafeCard rule" discussed above does not apply to individuals "who were convicted or pled guilty for their roles" in the relevant conduct or investigation.  CREW II, 854 F.3d at 681.  Courts have likewise stated that public officials, government employees, and prominent politicians' privacy interests with respect to law enforcement records are diminished where they have made public statements regarding an investigation.  Kimberlin v. Dep't of Just., 139 F.3d 944, 949 (D.C. Cir. 1998) ("government officials, as we have stated before, may have a 'somewhat diminished' privacy interest") (quoting Quinon v. FBI, 86 F.3d 1222, 1230 (D.C. Cir. 1996)); Perlman, 312 F.3d at 107 ("[An individual's] privacy interest is 'somewhat diminished' by his status as a government employee.") (quoting Kimberlin 139 F.3d at 949)); Nation Mag., Washington Bureau v. U.S. Customs Serv., 71 F.3d 885, 896 (D.C. Cir. 1995) ("[Presidential Candidate Ross] Perot's decision to bring information connecting himself with such efforts into the public domain differentiates his privacy interest from the interest of unnamed SafeCard witnesses.").  To the extent that a politician, public official, or government employee has made public statements concerning the subject matter of an investigation, district courts must determine whether shielding their identifying information "would [] serve any useful purpose in protecting [the individual's] privacy."  Nation Mag., 71 F.3d at 896.

While Kimberlin and similar cases cited by Plaintiffs suggest that certain public officials have a "somewhat diminished" privacy interest based on their prominence, Kimberlin, 139 F.3d at 944, 949, Plaintiffs have not cited any case holding that an ordinary citizen's privacy interest diminishes because his or her name was mentioned in a court filing or because they have made public statements concerning the investigation.  Individuals do not "waive" their privacy interests "merely by acknowledging [an] investigation."  Id. at 949.

As to the first group cited by Plaintiffs – people "explicitly named in [Epstein's 2007] plea document as receiving immunity" – Plaintiffs rely on a 2007 "non-prosecution agreement" between Epstein and the United States Attorney's Office for the Southern District of Florida.  (Pltf. Br. (Dkt. No. 43) at 20-21)  In the non-prosecution agreement – which was filed as an exhibit to a civil complaint filed against Epstein – the "United States [] agree[d] that it [would] not institute criminal charges against any potential co-conspirators of Epstein, including but not limited to [certain individuals listed in Plaintiffs' brief]."  (Podhurst Orseck, P.A. v. Epstein, 10 Civ. 21586 (ASG) (S.D. Fla 2010) Cmplt., Ex. A (Non-Prosecution Agreement) (Dkt. No. 1-3) at 6)  Plaintiffs do not allege, however, that these individuals (1) have been "convicted or [pleaded] guilty" to a role in Epstein and Maxwell's sex trafficking scheme, see CREW II, 854 F.3d at 681; (2) are "government official[s]" who have made "statement[s] to the press" concerning "what[,] [if anything, they] were accused of," see Kimberlin, 139 F.3d at 949; (3) are the subject of government "agency press releases or testimony in open court" naming them "as having been charged, convicted or otherwise implicated" in the Epstein affair, CREW II, 854 F.3d at 682; or (4) are discussed in a published judicial opinion reviewing allegations of misconduct made against them.  See Bartko v. United States Dep't of Just., 898 F.3d 51, 69 (D.C. Cir. 2018) ("Wheeler's [privacy] interest is substantially diminished . . . [given that] the

allegations of misconduct during the <u>Bartko</u> trial are already a matter of public record, as is the referral to OPR published in the Fourth Circuit's decision, and the U.S. Attorney's public announcement that it too was referring the allegations of misconduct to OPR.").

Acknowledging that the four individuals at issue are listed as potential "co-conspirators" of Epstein in the latter's non-prosecution agreement, the Court cannot conclude that – as a result – they have a diminished expectation of privacy with respect to documents held by the FBI containing their names.

Epstein and Maxwell's alleged victims, and Dershowitz, are likewise not public officials, nor are their "activities significant in their connection to agency conduct." <u>Nation Mag.</u>, 71 F.3d at 895 ("[FOIA requesters were] especially interested in documents and records that pertain to offers by Mr. Perot to assist the Customs Service in the interdiction of illegal drugs.").

As to certain of Epstein's alleged victims who have discussed their involvement with Epstein publicly, however, Plaintiffs have proffered (1) an article discussing a documentary featuring interviews with those victims; and (2) three articles concerning the release of transcripts of testimony in a lawsuit brought by Virginia Giuffre against Maxwell for her role in Epstein's trafficking ring.  (<u>See</u> Pltf. Br. (Dkt. No. 43) at 21-22)  The articles discuss, <u>inter alia</u>, Giuffre's allegations that "Maxwell and Epstein ordered her to have sex with men."  <u>See</u>, <u>e.g.</u>, Bill Chappell & Scott Neuman, "Judge Releases Trove of Sealed Records Related To Lawsuit Against Ghislaine Maxwell," NPR, (July 31, 2020) https://www.npr.org/2020/07/31/896627505/judge-releases-trove-of-sealed-records-related-tocase-against-ghislaine-maxwell.

Acknowledging that certain of Epstein's victims have publicly discussed being trafficked by Maxwell and Epstein, these individuals remain victims of and witnesses to the scheme.  And given the nature of Epstein and Maxwell's conduct towards the alleged victims, it is almost certain that the records sought by Plaintiffs contain highly sensitive material about Giuffre and other victims and witnesses.  See Summers, 2004 WL 7333532, at *4 ("[I]n the context of this high profile criminal investigation, these individuals clearly have more than a minimal privacy interest in not having their identities exposed.").  Accordingly, Giuffre and those similarly situated maintain significant privacy interests in the records at issue.

As to Dershowitz, Plaintiffs have cited only articles in which Dershowitz denies any wrongdoing in connection with his representation of Epstein.  (Pltf. Br. (Dkt. No. 43) at 22) To the extent that Dershowitz has been accused of misconduct, "official confirmation of what has been reported in the press and the disclosure of additional details could reasonably be expected to constitute an unwarranted invasion of [Dershowitz's] personal privacy."  Kimberlin, 139 F.3d at 949.  Accordingly, Dershowitz's privacy interest with respect to the records at issue is undiminished.

As with the other witnesses, third parties, and investigators named in the FBI's records, the public interest in shedding light on the Bureau's activities is not served by the disclosure of records that name and identify Giuffre or any of Epstein's victims, Dershowitz, and the others listed in Plaintiff's brief.  See U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press, 489 U.S. 749, 774 (1989) ("[Revealing sensitive private information] would tell us nothing directly about the character of the [agency's] behavior.").

*　　　*　　　*　　　*

In sum, the FBI has met its burden to establish that it properly withheld private information pertaining to the eight categories of individuals listed in the Seidel declaration.

## VI.   **EXEMPTION 7(D)**

Exemption 7(D) protects from disclosure law enforcement records that "could reasonably be expected to disclose the identity of a confidential source, . . . [who] furnished information on a confidential basis[] . . . [or] information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).   "Under Exemption 7(D), the question is not whether the requested <u>document</u> is of the type that the agency usually treats as confidential, but whether the particular <u>source</u> spoke with an understanding that the communication would remain confidential."  <u>DOJ v. Landano</u>, 508 U.S. 165, 172 (1993) (emphasis in original).  "[C]onfidentiality is not limited to complete anonymity or secrecy.  A statement can be made 'in confidence' even if the speaker knows the communication will be shared with limited others, as long as the speaker expects that the information will not be published indiscriminately."  <u>Id.</u>  Accordingly, "disclosure is not required 'if the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'"  <u>Halpern v. F.B.I.</u>, 181 F.3d 279, 298 (2d Cir. 1999) (quoting <u>Landano</u>, 508 U.S. at 172).

There is no "presumption" that an FBI source has provided information pursuant to an explicit or implicit assurance of confidentiality.  <u>Landano</u>, 508 U.S. at 174-78; <u>see also</u> <u>CREW I</u>, 746 F.3d at 1101 ("'[I]t is not enough for the agency to claim that all sources providing information in the course of a criminal investigation do so on a confidential basis.'") (quoting <u>Roth v. DOJ</u>, 642 F.3d 1161, 1184 (D.C. Cir. 2011)).

Instead, the FBI must "point to more narrowly defined circumstances that . . . support the inference" of confidentiality.  When no express assurance of

> confidentiality exists, courts consider a number of factors to determine whether the source nonetheless "spoke with an understanding that the communication would remain confidential."  These factors include "the character of the crime at issue," "the source's relation to the crime," whether the source received payment, and whether the source has an "ongoing relationship" with the law enforcement agency and typically communicates with the agency "only at locations and under conditions which assure the contact will not be noticed."

Roth, 642 F.3d at 1184 (quoting Landano 608 U.S. at 172, 179)  And "[e]ven when the FBI contends that a source received an express assurance of confidentiality, it must, in order to 'permit meaningful judicial review,' present sufficient evidence that such an assurance was in fact given."  Id. (quoting Campbell v. DOJ, 164 F.3d 20, 34 (D.C. Cir. 1998)).

The Seidel declaration identifies four Exemption 7(D) categories:  (1) names and identifying information of sources and information provided by sources "under circumstances in which confidentiality can be inferred"; (2) names and identifying information of sources and information provided by sources "under express grants of confidentiality"; (3) "information provided to the FBI from a foreign agency under circumstances in which confidentiality can be inferred"; and (4) names and identifying information of local law enforcement personnel, and information provided such personnel "under an implied assurance of confidentiality."  (Seidel Decl. (Dkt. No. 50) ¶¶ 87-94)

Plaintiffs challenge all four categories and argue that "the FBI has only offered a bald claim that witnesses expected confidentiality," has provided no evidence that its sources received an express grant of confidentiality, and has not "pointed to 'more narrowly defined circumstances' that support the inference of confidentiality."  (Pltf. Br. (Dkt. No. 43) at 26-27 (quoting CREW I, 746 F.3d at 1101))

As to the Seidel declaration's second category – information provided under an express grant of confidentiality – Seidel merely asserts that

> when processing the records at issue, the FBI found evidence these individuals, who provided specific and detailed information that is singular in nature, either requested their identities not be revealed; and/or FBI investigators would have, by standard practice, expressly promised these third parties their identities and the information they provided would remain confidential.

(Seidel Decl. (Dkt. No. 50) ¶ 90)  The FBI has not submitted any "probative evidence" that any source received an express grant of confidentiality in the form of, for example, "notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources."  Campbell v. DOJ, 164 F.3d 20, 34 (D.C. Cir. 1998), as amended (Mar. 3, 1999); Roth, 642 F.3d at 1184 ("Even when the FBI contends that a source received an express assurance of confidentiality, it must . . . present sufficient evidence that such an assurance was in fact given.").

Moreover, Seidel is the FBI's "Section Chief for the Record/Information Dissemination Section [], Information Management Division" (Seidel Decl. (Dkt. No. 50) ¶ 1), and there is no evidence that he participated in the Epstein investigation or otherwise has "personal knowledge of the particular events" in which sources received express assurances of confidentiality.  Campbell, 164 F.3d at 35.  And if any of the records "reveal express guarantees of confidentiality on their face," no such evidence has been presented to the Court.  Id.

In sum, the FBI has not carried its burden to demonstrate an express assurance of confidentiality.

As to Seidel's first category – sources who provided information under "circumstances in which confidentiality can be inferred" – the only factual circumstance cited by the FBI is that its sources held "unique positions allowing them ready access to and/or

44

knowledge about investigative targets and others involved in child prostitution or trafficking of a minor."  (Seidel Decl. (Dkt. No. 50) ¶ 88)  While "generic circumstances" can sometimes give rise to an "implied assurance of confidentiality," Landano, 508 U.S. at 179, the fact that Epstein and Maxwell's crimes involved "child sexual abuse" does not alone "support a finding of some implicit confidentiality agreement."  See Bagwell v. U.S. Dep't of Just., 588 F. Supp. 3d 58, 71 (D.D.C. 2022)  While "courts are more willing to infer confidentiality in cases where the crimes at issue are particularly violent," Ramaci v. FBI, 568 F. Supp. 3d 378, 388 (S.D.N.Y. 2021), the sources at issue here are not comparable to a "'witness[] to a gang-related murder[,]' [which] the Supreme Court offered as an example of someone who might be 'unwilling to speak . . . except on the condition of confidentiality.'"  Bagwell, 588 F. Supp. 3d at 71 (quoting Landano, 508 U.S. at 179).  Nor has the Bureau proffered evidence that its sources have reason to fear retaliation.  See Computer Pros. for Soc. Resp. v. U.S. Secret Serv., 72 F.3d 897, 906 (D.C. Cir. 1996), amended (Feb. 20, 1996) ("[T]he Service offered no evidence that a fear of retaliation by hackers is sufficiently widespread to justify an inference that sources of information relating to computer crimes expect their identities and the information they provide to be kept confidential.").

Nor does the Seidel declaration discuss any "narrowly defined circumstances that [] support the inference" of confidentiality, such as a paid informant, an informant that had an "ongoing relationship with the Bureau," or an informant who met with the Bureau in unique or unusual "locations and [] conditions."  See Landano, 508 U.S. at 179.  Indeed, the portions of the Seidel declaration addressing this category are mere boilerplate, citing "1) the singularity of the information provided and the likelihood these individuals could be identified through release of this information by those familiar with the events described; 2) the proximity of these sources to

the investigative subjects and events they described; 3) and the nature of the criminal acts they

described." (Seidel Decl. (Dkt. No. 50) ¶ 87)  But Seidel does not explain or provide any details

regarding the "singularity of the information provided," "the proximity of [the FBI's] sources" to

Epstein, Maxwell or other investigative subjects, or "the nature of [any] criminal acts."  (Id.)

Accordingly, the FBI has not satisfied its burden to show that its sources provided information

under an implicit expectation of confidentiality.

        As to Seidel's third category – information provided by foreign agencies – the

FBI asserts that it "solicits and receives information from . . . foreign agencies" in connection

"with a wide variety of criminal and national security investigations."  (Seidel Decl. (Dkt. No.

50) ¶ 92)  According to the FBI, the "understanding that the identity of such a source . . . will be

held in confidence" is "[i]nherent" to such cooperation.  (Id.)  The FBI then notes that the release

of records which "reveal the existence of a confidential relationship with a foreign government

reasonably could be expected to strain relations between the United States and the foreign

government and lead to diplomatic or economic retaliations . . . [and to have] a chilling effect on

the free flow of vital information to" the FBI.  (Id.)

        These justifications are insufficient.  As noted at the outset, the relevant inquiry is

whether release of the records "could reasonably be expected to disclose the identity of a

confidential source, including a state, local or foreign agency," or information provided by such

a source – not whether release could reasonably be expected to "strain relations" between the

United States and other countries.  5 U.S.C. § 552(b)(7)(D).  In any event, the FBI has not

submitted evidence that any "particular foreign government agency that the FBI [seeks] to

protect via its redactions requested that its identity, relationship with FBI, and the information it

provided be classified and withheld."  Shapiro v. Cent. Intel. Agency, 247 F. Supp. 3d 53, 68

(D.D.C. 2017); Stein v. U.S. Dep't of Just., 134 F. Supp. 3d 457, 486 (D.D.C. 2015) ("The only statement that the FBI makes about the implied assurance of confidentiality purportedly made [to the foreign agency or agencies] . . . is an entirely conclusory recitation of the burden it must meet[.] . . . This is not sufficient.")  Accepting the FBI's assertion that expectations of privacy are "[i]nherent" to cooperation with foreign agencies (Seidel Decl. (Dkt. No. 50) ¶ 92) – without evidence of any explicit or implicit assurance of confidentiality – amounts to applying the sort of "presumption of confidentiality" that the Supreme Court has explicitly rejected. See Landano, 508 U.S at 181 ("[T]he Government is not entitled to a presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information to the FBI in the course of a criminal investigation.").

As to Seidel's fourth category – information from local law enforcement agencies – he states that local

> law enforcement authorities provided specific detailed information of value to the FBI, that is singular in nature, concerning Jeffrey Epstein.  The FBI inferred these personnel provided this information to the FBI with an expectation their involvement in the investigation, and/or the information they provided, would remain confidential due to the following:  the information provided pertains to unknown investigations pursued by these agencies; or the information would expose the agency's personnel to undue public scrutiny based on their involvement with these particular matters.

(Seidel Decl. (Dkt. No. 50) ¶ 93)

The Court concludes that the FBI has sufficiently established that records provided by local law enforcement authorities were provided under "more narrowly defined[,] . . . [although] generic circumstances [from] which an implied assurance of confidentiality can fairly be inferred." See Landano, 508 U.S. at 179.  Epstein's illegal activities spanned decades and took place in a variety of locations, including New York, Florida, and the Virgin Islands.  It is reasonable to assume that local law enforcement authorities who provided information to the

FBI have their own sources and investigations to protect.  It is also reasonable to assume that local law enforcement agencies would expect that the information they provided to the FBI would be maintained as confidential.

In sum, the FBI has not provided sufficient evidence that explicit or implicit assurances of confidentiality were made to the FBI's own sources and to foreign agencies. However, the FBI has met its burden with respect to information provided by local law enforcement agencies.

## VII.   EXEMPTION 7(E)

Exemption 7(E) applies to law enforcement records the release of which "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The qualification "'such disclosure could reasonably be expected to risk circumvention of the law'[] modifies only 'guidelines' and not 'techniques and procedures.'"  Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec., 626 F.3d 678, 681 (2d Cir. 2010); see also id. ("When Congress [amended FOIA] . . . in 1986, it expanded the scope of Exemption 7(E) by adding the entire second clause[,] . . . thereby exempting 'guidelines' from disclosure only if public access to such guidelines would risk circumvention of the law.").  Accordingly, "techniques and procedures" are exempt from disclosure "without need for [a] demonstration of harm."  Id. (quoting Keys v. Dep't of Homeland Sec., 510 F.Supp.2d 121, 129 (D.D.C. 2007)). "The term 'guidelines' . . . generally refers in the context of Exemption 7(E) to resource allocation . . . [while] phrase 'techniques and procedures,' [] refers to how law enforcement officials go about investigating a crime."  Id. at 682.

The FBI has asserted Exemption 7(E) as to the following categories of information found within the records Plaintiffs seek:  (1) "methods the FBI uses to collect and analyze information it obtains for investigative purposes"; (2) "sensitive investigative file numbers . . . [which identify] the investigative interest or priority given to [particular] matters"; (3) the "type of investigations," such as "preliminary" or "full"; (4) "the target, dates and scope of [] surveillance [operations]"; (5) information located within the FBI's FD-515 forms used to report "investigative accomplishments, . . . such as an arrest, conviction, sentencing, [or] asset seizure"; (6) nonpublic database identifiers or printouts; and (7) monetary payments or funding needed for investigative purposes.  (Seidel Decl. (Dkt. No. 50) ¶¶ 98-112)  For each category of information, regardless of whether classified as "guidelines" or "techniques and procedures," the Seidel declaration explains how "disclosure could reasonably be expected to risk circumvention of the law."  (Id.)

The Court concludes that the FBI has satisfied its burden under Exemption 7(E) – each category of information identified in the Seidel declaration qualifies as "techniques and procedures . . . [or] guidelines . . . [the] disclosure [of which] could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(D); see also Shapiro v. Dep't of Just., 2020 WL 3615511, at *36 (D.D.C. July 2, 2020), aff'd in part, remanded in part on other grounds, 40 F.4th 609 (D.C. Cir. 2022) (finding that the FBI met its burden under Exemption 7(E) as to, inter alia, "methods the FBI uses to collect and analyze the information," "information regarding monetary payments," "how, under what circumstances, and on whom the FBI conducts surveillance," and "FBI Form FD-515"); Gonzalez v. United States Citizenship & Immigr. Servs., 475 F. Supp. 3d 334, 352 (S.D.N.Y. 2020) ("[Law enforcement file and] event codes and URLs of internal law enforcement databases[] [are] properly withheld under Exemption 7(E).");

Ford v. Dep't of Just., 208 F. Supp. 3d 237, 253 (D.D.C. 2016) ("[The FBI] also withheld information pertaining to . . . whether an investigation is preliminary or full and the date of its initiation. . . . [T]he FBI's justification for withholding this information is adequate.").

        Plaintiffs do not contest the FBI's reasoning and instead argue that, as with Exemption 7(D), the FBI "offers nothing more [] than a paraphrase of [E]xemption 7(E)."  (Pltf. Br. (Dkt. No. 43) at 27)  This argument ignores the Seidel declaration's detailed description of the guidelines, techniques and procedures the FBI seeks to protect under Exemption 7(E).  The Court concludes that the FBI has "logically explain[ed] how the [requested information] could help criminals circumvent the law, and that suffices here to justify invocation of Exemption 7(E)."  Blackwell v. F.B.I., 646 F.3d 37, 42 (D.C. Cir. 2011).

## VIII.   SEGREGABILITY

        "FOIA . . . provides that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" Conti, 2014 WL 1274517, at *25 (quoting 5 U.S.C. § 552(b)).  "[T]he agency must provide a detailed justification for its decision that non-exempt material is not segregable," but "is entitled to a presumption that it complied with its obligation to disclose reasonably segregable material." Id. (citing Mead Data Cent., Inc. v. U.S. Dept. of Air Force, 566 F.2d 242, 261 (D.C. Cir. 1977)). "[T]o justify withholding an entire document[,] the DOJ . . . must demonstrate that [it] cannot delineate between exempt and non-exempt information therein."  Ayyad v. U.S. Dept. of Justice, 2002 WL 654133, at *2 (S.D.N.Y. Apr. 18, 2002).

Here, the FBI argues that the "records withheld in full under . . . Exemption 7(A)" do "not contain any reasonably segregable information."[15]  The FBI has not met its burden to establish the applicability of Exemption 7(A) as to all of the withheld documents, however. Accordingly, the Court cannot evaluate whether the FBI has met its burden with respect to segregability.  See Seife v. United States Dep't of State, 298 F. Supp. 3d 592, 629 (S.D.N.Y. 2018) (court "not yet in a position to reach the question of segregability" where the agency has failed to meet its burden in initial summary judgment briefing).

## IX.  **PLAINTIFFS' CROSS-MOTION**

Where, as here, an agency "'fails to provide a sufficiently detailed [declaration] to enable the district court to make a de novo determination of the agency's claims of exemption, the district court then has several options, including inspecting the documents in camera, requesting further affidavits, or allowing the plaintiff discovery.'"  Id. (quoting Spirko v. U.S. Postal Serv., 147 F.3d 992, 997 (D.C. Cir. 1998))  Because there are tens of thousands of pages of records at issue here (see Vaughn index (Dkt. No. 50-31) at 164), in camera review is not a practical solution for the FBI's inadequate declarations.  In any event, "'[a] district court should not undertake in camera review of withheld documents as a substitute for requiring an agency's

---

[15]  In its moving brief, the FBI states that "[t]he records withheld in full by the FBI do not contain any reasonably segregable non-exempt information.  With regard to the records withheld in full under Exemption 7(A), the Comey Declaration explains why each category of records is exempt from disclosure. . . . As to the remaining records withheld in full, either the records are privileged in their entirety or any non-exempt information in the documents is inextricably intertwined with exempt information."  (Def. Br. (Dkt. No. 38) at 33 (citations omitted))  It is not clear what the FBI's purpose is in differentiating between "records withheld in full under Exemption 7(A)" and "the remaining records withheld in full."  (Id.)  The Seidel declaration and the FBI's brief say that the FBI has asserted Exemption 7(A) as to "all [] protected information" withheld before the July 2019 Epstein indictment as well as "all remaining responsive documents."  (Seidel Decl. (Dkt. No 50) ¶ 30 & n.4; Def. Br. (Dkt. No. 38) at 11)  The FBI's 11,000 line Vaughn index also indicates that the FBI has asserted Exemption 7(A) as to each record withheld in full.  (Vaughn Index (Dkt. No. 50-31))

explanation of its claimed exemptions in accordance with <u>Vaughn</u>.'"  <u>New York Times Co. v.</u> <u>U.S. Food & Drug Admin.</u>, 529 F. Supp. 3d 260, 270 (S.D.N.Y. 2021) (quoting <u>Seife</u>, 298 F. Supp. 3d at 629).

Moreover, given the circumstances here, it would not be appropriate for this Court to order the FBI to produce the responsive records with redactions for those portions that fall within one of the exemptions for which the FBI has sustained its burden.  "'Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.'"  <u>See</u> <u>Spadaro</u>, 978 F.3d at 41 (quoting <u>Sussman v.</u> <u>U.S. Marshals Serv.</u>, 494 F.3d 1106, 1116 (D.C. Cir. 2007)).  As discussed above, a segregability analysis cannot be performed, because the FBI has not carried its burden as to certain exemptions.  The inadequacy of the FBI's declarations as to the bulk of the claimed exemptions thus makes it impossible for this Court to make the necessary segregability findings.

District courts frequently encounter such circumstances in FOIA cases, and direct the defendant agency to file revised declarations and the parties to file renewed motions for summary judgment.  <u>See</u>, <u>e.g.</u>, <u>Prop. of the People</u>, 2021 WL 3052033, at *3 ("For the foregoing reasons, the Court will deny Defendant's Cross-Motion for Summary Judgment . . . and require more specific justifications for its withholdings."); <u>McGehee</u>, 800 F. Supp. 2d at 239 ("Defendant's Motion for Summary Judgment is granted in part and denied in part. . . . Defendant must file an updated <u>Vaughn</u> index in conformity with this Memorandum Opinion . . . ."); <u>ACLU</u>, 210 F. Supp. 3d at 486 ("DOJ is directed to submit revised <u>Vaughn</u> submissions a . . . and a segregability analysis . . . along with a renewed motion for partial summary judgment."); <u>New York Times Co.</u>, 499 F. Supp. 2d at 519 ("Following a review of Defendants' additional submissions, the Court will determine whether summary judgment is appropriate with

respect to the Unclassified Documents and the adequacy of the DOD search."); Seife, 298 F.

Supp. 3d at 629 ("The State Department is directed to submit revised Vaughn submissions . . . as

well as a segregability analysis . . . along with a renewed motion for partial summary judgment

. . . .[Plaintiff] may [also] file a renewed cross-motion for summary judgment.").

   Of course, where an agency "has satisfied its burden," a FOIA requester may still,

in theory, secure production of the requested documents by demonstrating "bad faith on the part

of the agency sufficient to impugn the agency's affidavits or declarations, or provide some

tangible evidence that an exemption claimed by the agency should not apply or summary

judgment is otherwise inappropriate."  Carney, 19 F.3d at 812.  But this rule says nothing about a

FOIA requester's remedy where an agency has failed to meet its burden in the first instance, but

the requester lacks evidence of bad faith or proof that a claimed exemption should not apply.[16]

In any event, Plaintiff has submitted no such "tangible evidence" in this case.  See Elec. Frontier

Found. v. Cent. Intel. Agency, 2013 WL 5443048, at *26 (N.D. Cal. Sept. 30, 2013)

("[S]ummary judgment is not warranted [for the plaintiff] given the Court's conclusion that

Defendants' Vaughn submissions are inadequate, not that information has been improperly

withheld.").

   While the current FOIA regime does not incentivize agencies to file adequate

declarations in the first instance – because they will likely be given another opportunity to seek

summary judgment on the basis of revised declarations – this Court is not aware of any decision

---

[16]  Where the adequacy of an agency's search, rather than the applicability of a FOIA exemption, is at issue, district courts may order discovery.  See Fams. for Freedom v. U.S. Customs & Border Prot., 837 F. Supp. 2d 331, 337 (S.D.N.Y. 2011) (ordering "limited discovery" where defendants had, "[f]or over a year, . . . not complied with FOIA's requirements" and conducted "inadequate searches" for responsive records).  Here, however, Plaintiffs have not disputed the adequacy of the FBI's search.

that has directed disclosure of agency records where an agency's initial declaration has been inadequate to support the applicability of a FOIA exemption.  And, as discussed above, this Court cannot order disclosure of some portion of the requested records at this juncture because it cannot make the requisite finding as to segregability.  See Spadaro, 978 F.3d at 41.

### CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is granted with respect to documents withheld pursuant to Exemption 3 (as it relates to the Child Victims' Act) and Exemptions 5, 6, 7(C), 7(D) (as to information provided by local law enforcement agencies), and 7(E), and is otherwise denied without prejudice.  Plaintiffs' cross-motion for summary judgment is granted to the extent that this Court has found that the Government's declarations are inadequate to support application of certain FOIA exemptions. Plaintiffs' summary judgment is otherwise denied without prejudice.

The parties shall confer and submit a joint letter by **October 6, 2023**, stating how they propose to proceed.  The parties' letter should contain a proposed schedule for the FBI's submission of revised declarations, as well as any renewed motions for summary judgment.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 37, 42).

Dated:  New York, New York
         September 19, 2023                    SO ORDERED.

                                               Paul G. Gardephe
                                               United States District Judge

54