UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF YORK
──────────────────────────────────────x

RADAR ONLINE LLC and JAMES
ROBERTSON,

                               Plaintiffs,

      -v-                                                                       17 Civ. 3956 (PGG)

FEDERAL BUREAU OF INVESTIGATION,

                               Defendant.
──────────────────────────────────────x

## THIRD DECLARATION OF MAURENE COMEY

    I, Maurene Comey, hereby declare as follows:

    1.    I am an Assistant United States Attorney in the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") and currently serve as Co-Chief of the Public Corruption Unit. I have served in this capacity since January 2023. Prior to my current role, I served as Co-Chief of the Violent and Organized Crime Unit of the USAO-SDNY from May 2021 through January 2023, Deputy Chief of the Violent and Organized Crime Unit of the USAO-SDNY from February 2021 through May 2021, an Assistant United States Attorney in the Public Corruption Unit of the USAO-SDNY from September 2019 through February 2021, an Assistant United States Attorney in the Violent and Organized Crime Unit of the USAO-SDNY from July 2017 through September 2019, an Assistant United States Attorney in the White Plains Division of the USAO-SDNY from January 2016 through July 2017, and an Assistant United States Attorney in the General Crimes Unit of the USAO-SDNY from November 2015 through January 2016. I have been

an Assistant United States Attorney in the Southern District of New York since November 2015. Currently, I am one of the Assistant United States Attorneys handling the prosecution of Ghislaine Maxwell, an individual who associated with Jeffrey Epstein. Prior to his death, I was also one of the Assistant United States Attorneys in charge of the prosecution of Jeffrey Epstein.

    2.    I am familiar with the Freedom of Information Act request filed by Radar Online LLC (the "FOIA Request") that is the subject of this case, which seeks records relating to the "FBI's investigation and the prosecution of Jeffrey Epstein, who plead guilty to one count of felony solicitation of prosecution in August 2006." By either reviewing certain records in preparation for the prosecution or review of samples of all of the categories of documents, I am familiar with the responsive records that the Federal Bureau of Investigation ("FBI") has withheld pursuant to Exemptions 3, 5, 6, 7(A), 7(C), 7(D), and 7(E) of FOIA, 5 U.S.C. § 552(b)(5)-(7). In addition, I am familiar with the proceedings in *United States v. Maxwell*, 22-1426 (2d Cir.); *United States v. Maxwell*, 20-cr-330 (AJN) (S.D.N.Y.); and *United States v. Epstein*, No. 19-cr-490 (RMB) (S.D.N.Y.). The statements contained in this declaration are based on my personal knowledge, documents maintained in the files of the USAO-SDNY, documents maintained in the files of the FBI, conversations with the members of the *Maxwell* and *Epstein* prosecution teams at the USAO-SDNY, conversations with FBI employees, public court filings, and conclusions made in accordance therewith.

    3.    I submit this supplemental declaration in support of the FBI's renewed motion for summary judgment in this case and pursuant to this Court's September 19, 2023 Memorandum Opinion & Order requiring the Government to submit revised declarations to address the issues regarding which the Court found the Government's initial declarations in

support of its summary judgment motion inadequate.  *See* Dkt. No. 51 at 9-54.

### The Prosecution of Jeffrey Epstein

4.       On July 2, 2019, Jeffrey Epstein was indicted by a federal grand jury in the United States District Court for the Southern District of New York on one count of conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 371, and one count of sex trafficking, in violation of 18 U.S.C. §§ 1591(a), (b)(2). *United States v. Epstein*, No. 19 Cr. 490 (RMB) (S.D.N.Y.), Dkt. No. 2.  Epstein passed away on August 10, 2019. *Id.*, Dkt. No. 44.

5.       On August 29, 2019, following a public hearing on August 27, 2019, Judge Berman entered an order of *nolle prosequi* dismissing the charges against Epstein. *See id.*, Nolle Prosequi, Dkt. No. 52.

### The Prosecution of Ghislaine Maxwell

6.       On June 29, 2020, Ghislaine Maxwell was indicted by a grand jury in the Southern District of New York with one count of conspiracy to entice minors to travel to engage in illegal sex acts, in violation of 18 U.S.C. § 371, one count of enticement of a minor to travel to engage in illegal sex acts, in violation of 18 U.S.C. §§ 2422 and 2, one count of conspiracy to transport minors with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 371, one count of transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2423(a) and 2, and two counts of perjury, in violation 18 U.S.C. 1623.  *See United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y.), Dkt. No. 1.

7.       On March 29, 2021, a grand jury in the Southern District of New York returned a superseding indictment charging Ghislaine Maxwell with one count of conspiracy

to entice minors to travel to engage in illegal sex acts, in violation of 18 U.S.C. § 371, one count of enticement of a minor to travel to engage in illegal sex acts, in violation of 18 U.S.C. §§ 2422 and 2, one count of conspiracy to transport minors with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 371, one count of transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2423(a) and 2, one count of sex trafficking conspiracy, in violation of 18 U.S.C. § 371, one count of sex trafficking of a minor, in violation of 18 U.S.C. §§ 1591 and 2, and two counts of perjury, in violation 18 U.S.C. § 1623. *See id.*, Dkt. No. 187.

8.  The trial of Maxell started on November 29, 2021. *See id.*, Dkt. No. 277. After a nearly month-long trial, on December 29, 2021, a jury convicted Maxwell of multiple counts, and on June 29, 2022, Judge Alison J. Nathan entered judgment sentencing Maxwell to a total of 20 years' imprisonment for one count of conspiracy to transport minors with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 371, one count of transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423, and one count of sex trafficking of an individual under the age of eighteen, in violation of 18 U.S.C. § 1591. *See United States v. Maxwell*, No. 20 Cr. 330 (AJN) (S.D.N.Y.), Dkt. No. 696.

9.  On July 7, 2022, Maxwell appealed the criminal judgment to the United States Court of Appeals for the Second Circuit. *See id.* at 697. In her appeal, Maxwell is seeking, among other things, a new trial based on alleged juror misconduct and alleged evidentiary issues. *See United States v. Maxwell*, 22-1426 (2d Cir.), Dkt. No. 59 at 2, 63-81, 86-87. The appeal remains pending. Maxwell filed her initial brief on February 28, 2023; the Government filed its opposition brief on June 29, 2023; and Maxwell filed her reply brief on

July 27, 2023. *United States v. Maxwell*, 22-1426 (2d Cir.), Dkt. Nos. 59, 79, 87. The parties are awaiting a schedule for oral argument, and ultimately, a decision from the Second Circuit.

### Records Withheld from Disclosure Pursuant to FOIA Exemption 7(A) on Account of Likely Interference with the Prosecution of Maxwell

10.     5 U.S.C. § 522 (b)(7)(A) ("Exemption 7(A)") exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings . . . ."

11.     The prosecutors responsible for the *Maxwell* prosecution and I are familiar with the records responsive to the FOIA requests withheld in full or in part under Exemption 7(A), including those reflected on the index prepared by the FBI and the declarations of Michael G. Seidel (the "FBI index"). All of these records fall within the scope of Exemption 7(A).

12.     As noted above, the *Maxwell* criminal prosecution is still pending on appeal. If the Second Circuit grants Maxwell the relief she seeks, there could be a new trial. Therefore, public disclosure of the FBI's records relating to the investigation and prosecution of Epstein that were withheld in full or in part under Exemption 7(A) could reasonably be expected to interfere with the pending prosecution of Maxwell.

13.     I have reviewed the declaration of Michael G. Seidel executed on June 28, 2021 (the "First Seidel Declaration") and agree with the description of the withheld records described in paragraphs 58 through 68 therein. Specifically, the records can be divided into the three categories outlined in the First Seidel Declaration: (1) Evidentiary/Investigative Materials; (2) Administrative Materials; and (3) Public Source/Non-Investigative Harm Materials.

14. Public disclosure of the first category of records, identified in the First Seidel Declaration as Evidentiary/Investigative Materials, could reasonably be expected to interfere with the pending prosecution of Maxwell. As noted in paragraphs 61 through 63 of the First Seidel Declaration, this first category includes copies of records or evidence, analysis of that evidence, and derivative communications summarizing or otherwise referencing evidence. Those records or evidence include, among other things: business records (for example, phone records, travel records, financial records, and shipping records) gathered during criminal investigations, including through the service of grand jury subpoenas, and analysis of those records; documents and evidence provided by witnesses to law enforcement; documents regarding witness background information (for example, criminal history records, medical records, employment records, social media records, and educational records); reports, notes, or transcripts of witness statements; and communications with and about witnesses. The documents contained in this category include confidential witness statements from dozens of witnesses, and the discussion of evidence among members of law enforcement. The release of these records to the public risks the following harms to the pending prosecution of Maxwell:

    a. <u>Impact on Witness Testimony:</u> Premature disclosure of the business records and witness statements within this category (including disclosure of analysis and summaries of those materials) could reasonably be expected to influence potential witnesses' testimony at trial. These records include details that are not publicly known or known to other witnesses, and include information and documents authored by and about potential witnesses. Because the majority of the records in this category were not introduced as public exhibits during Maxwell's first trial, they remain non-public, though the Government may

still seek to introduce them should Maxwell be granted a retrial. The premature release of these materials could influence the testimony of witnesses by providing the opportunity for witnesses to shape their testimony to conform with other evidence gathered during the investigation, including both records and witness statements. For example, witnesses may shade their testimony to match the descriptions of events and places given by other witnesses about whom they might not otherwise know, or witnesses may shade their testimony to match the timing of travel, financial transactions, phone calls, and/or shipments reflected in the records. In order to preserve the independent integrity of its witnesses' testimony, the Government has worked to ensure that its witnesses are not exposed to other parts of its investigative file, the accounts of other witnesses, or the full scope of exhibits it may offer at a retrial. The release of these materials would undermine the Government's efforts to present witness testimony that is uninfluenced by exposure to other evidence in the case and can therefore be independently corroborated by other witness accounts and exhibits at trial. Additionally, premature release of witness statements and background materials in this category could prevent the Government from effectively questioning witnesses in a manner that would allow jurors to assess their credibility because the witnesses may have already viewed records that counsel may use for impeachment purposes, including witness background materials, witness statements, and business records that might contradict witnesses' testimony.

        b.    <u>Impact on Witnesses' Willingness to Testify</u>: The business records, witness statements, and witness background materials within this category (including summaries and analysis thereof) contain sensitive personal and private information about dozens of potential witnesses, including some witnesses who testified at Maxwell's first trial

7

and many witnesses who were not called at Maxwell's first trial, but who may be called to testify if Maxwell is granted a retrial. By their very nature, all of the witness statements and witness background materials necessarily include identifying information and sensitive details regarding numerous witnesses. Similarly, the business records—including financial records, travel records, phone records, and shipping records—include the names, addresses, phone numbers, and other identifying information of numerous witnesses. The public release of this information could lead to the identification and intimidation of witnesses, who may decline to cooperate with the parties and be disinclined to testify if their personal information is released to the public. Indeed, multiple witnesses at Maxwell's first trial testified under pseudonyms or just their first name to protect their privacy. Those same witnesses likely would not have agreed to testify if their identities or sensitive information about them were publicly revealed. The premature release of these records could reasonably be expected to interfere with a potential retrial of Maxwell by causing witnesses to be identified in the media and face embarrassment and potential harassment from members of the public as a result. Should these records be released, many witnesses, including some witnesses who agreed to testify at Maxwell's first trial and others who did not testify at Maxwell's first trial but may be called at a retrial, may decline to cooperate in trial preparation with the Government and may refuse to testify at a retrial. This outcome is likely because many witnesses only agreed to cooperate with the Government's investigation because they understood that the Government would take every effort to protect their privacy.

        c.    <u>Impact on Jury</u>: Premature public disclosure of the records withheld under Exemption 7(A) within this first category, including those which the Government anticipates will be entered into evidence at trial, could reasonably be expected to further

8

impair the Government's pending prosecution of Maxwell by affecting its ability to present its case in court in any *Maxwell* retrial because it risks prejudicing the jury pool. As noted above, the majority of records in this category—including phone records, bank records, travel records, and shipping records—were not admitted into evidence at Maxwell's first trial. Similarly, many witnesses whose statements and background information fall within this category did not testify at Maxwell's first trial. The premature release of these materials risks prejudicing the jury pool so as to hinder the Government's ability to present its case in court in two distinct respects. First, to the extent materials within this category are never admitted at a retrial, the jury may wonder why those materials were absent from the trial and may suspect the Government of trying to hide evidence from the jury, causing jurors to draw an unwarranted adverse inference against the Government. In this scenario, the jury may also improperly consider publicly released materials that were not introduced as evidence at the trial in their deliberations. The materials in this category, including business records and witness statements, may seem relevant to a layperson but may be inadmissible at trial for various reasons under the Federal Rules of Evidence. Potential jurors' consideration of the records that are being withheld under Exemption 7(A) but will not be presented at trial may impact the consideration jurors give to the actual evidence presented by the Government. If some or all of this evidence is excluded at trial, pre-trial publication of these materials would risk exposing potential jurors to material they would otherwise not be shown during trial, which risks unduly influencing jurors' views of the case and would impair the Government's ability to effectively and fairly present its case in court. Second, if materials within this category are admitted at trial after being prematurely released, members of the jury could have preconceived notions of that evidence's relevance or importance. This is especially

9

concerning given the intense media scrutiny surrounding the *Maxwell* case and commentary that is likely to follow the release of any records of substance from the investigative file.

        d.    <u>Greater Access</u>: Certain materials within this first category, such as internal FBI analysis of records and work product resulting from that analysis, was not discoverable and therefore not produced to Maxwell. Disclosure of these materials would thus allow Maxwell to have greater access to the investigatory files than she would otherwise have through the criminal discovery process. As explained in my prior declarations, through the criminal discovery process, Maxwell had access to, among other things, testifying witness statements, material subject to disclosure pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), and material subject to disclosure pursuant to Federal Rule of Criminal Procedure 16. She did not have access to all of the FBI's files relating to the investigation and prosecution of Epstein. Release of all FBI records pertaining to the FBI's investigation and prosecution of Epstein therefore would provide Maxwell with greater access to records than she would otherwise have at any new trial.

        e.    <u>Protective Order</u>: Given the substantive nature of the materials in this first category, the Government has already produced the vast majority of the materials in this category to Maxwell in connection with her first trial. Emphasizing the risks of prejudice to witnesses and the jury should these materials be released to the public, these productions have all been subject to a Protective Order, entered by Judge Nathan, which prohibits the defense from disseminating Government productions to the public or the press. *See Maxwell*, No. 20 Cr. 330, Dkt. No. 36. The risks of interference with the *Maxwell* proceedings are heightened by the media coverage of the prosecution of Maxwell and her association with Epstein. The parties in the Maxwell matter are aware that media coverage may impact

potential witnesses and jurors, and as such, the parties have entered into the above-referenced Protective Order to allow the Government to produce discovery material, including the vast majority of materials in this first category, without disclosure of that information to the public. Thus, to allow disclosure of records withheld in full or in part by the FBI under Exemption 7(A) would be in contravention of the efforts made by the parties and the Court to provide an impartial trial and would therefore further affect the Government's ability to present its case in court.

    f. <u>No Objection to Production of Public Trial Exhibits</u>: Some materials in this first category were admitted as public exhibits at Maxwell's first trial. Because those exhibits, which represent a small fraction of the documents contained in this category, are already publicly available, the Government has no objection to their release. As noted in my prior declaration, Dkt. No. 47 ¶ 8, the Government has made available to the press upon request copies of all publicly admitted exhibits from trial. The Government will provide a copy of those publicly filed exhibits to the Plaintiffs upon request.

  15. Public disclosure of the second category of records, identified in the First Seidel Declaration as Administrative Materials, could also reasonably be expected to interfere with the pending prosecution of Maxwell. As noted in paragraphs 64 through 66 of the First Seidel Declaration, this second category includes: internal communications among investigators within the FBI providing updates regarding the status of the investigation, including witness interviews and discussion of evidence gathered during the investigation; communications between the FBI and other government agencies regarding the investigation; grand jury subpoenas identifying the names of witnesses and documents sought during the investigation; and organizational documents such as envelopes used to

organize and store documents and other evidentiary documents, bulky exhibit cover sheets, transmittal forms, and letter routing slips, some of which contain the names of witnesses, including victim-witnesses, and subjects of the investigation. In particular, the release of these records to the public risks the following harms to the pending prosecution of Maxwell:

      a.    <u>Impact on Witnesses</u>: Release of records pertaining to grand jury subpoenas, organizational documents such as cover sheets, and internal communications among investigators about the status of the investigation and investigative steps will allow potential witnesses to consider specific evidence and the volume of evidence prior to trial, which may influence their testimony in a manner similar to that outlined with respect to the first category, above. Similarly, release of records revealing communications among investigators and cover sheets listing types of records contained within the investigative file risks revealing to witnesses the steps investigators took and the types of evidence obtained during the investigation. Pretrial exposure to such information risks influencing witness testimony in a manner similar to that outlined with respect to the first category, above. In addition, certain materials within this category include identifying information for witnesses. For example, certain of the grand jury subpoenas, cover sheets, internal communications, and communications among law enforcement investigators include the names and other identifying information of witnesses. The release of those materials would thus identify witnesses and subject them to possible embarrassment and harassment, which, for the same reasons discussed with respect to the first category above, could lead witnesses to refuse to cooperate with trial preparation and decline to testify at a retrial.

      b.    <u>Impact on Jury</u>: Should potential jurors be able to view the FBI's communications regarding the investigation, forms, and grand jury subpoenas, they will

12

know who the FBI contacted during its investigation, information that was disclosed by witnesses, including witnesses who will not testify at trial, and the type and volume of evidence that was gathered by the FBI. Jurors may improperly consider this information in conjunction with the actual evidence that is presented at trial. For example, records used to identify or catalog evidence would reveal to potential jurors the evidence in the Government's possession and potentially the date such evidence was obtained. Similarly, transmittal forms or routing slips may contain the names of witnesses or timeframe during which the FBI was in focused on a specific individual. Records containing communications with other government agencies may reveal the sources of information and may cause jurors to give more or less weight to certain evidence. In addition, release of these records may cause jurors to speculate about the evidence that will be used at trial and cause them to alter their views of the evidence presented at trial. Therefore, premature release of the evidence in this category would hinder the Government's ability to present its case in court by threatening to prejudice the jury pool.

        c.      <u>Greater Access</u>: Many of the materials within this second category, including grand jury subpoenas, cover sheets, internal FBI communications, and communications with other law enforcement agents, were not discoverable and therefore not produced to Maxwell. Disclosure of these materials would thus allow Maxwell to have greater access to the investigatory files than she would otherwise have through the criminal discovery process. As explained in my prior declarations, through the criminal discovery process, Maxwell had access to, among other things, testifying witness statements, material subject to disclosure pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), and material subject to disclosure pursuant to Federal Rule of Criminal Procedure 16. She did not have

13

access to all of the FBI's files relating to the investigation and prosecution of Epstein. Release of all FBI records pertaining to the FBI's investigation and prosecution of Epstein therefore would provide Maxwell with greater access to records than she would otherwise have at any new trial.

        d.    <u>Protective Order</u>: To the extent some subset of materials within this category have been produced to Maxwell in connection with her criminal case, those productions were all subject to the Protective Order described above, which prohibits the defense from disseminating Government productions to the public or the press. *See Maxwell*, No. 20 Cr. 330, Dkt. No. 36. Thus, to allow disclosure of records withheld in full or in part by the FBI under Exemption 7(A) would be in contravention of the efforts made by the parties and the Court to provide an impartial trial and would therefore further affect the Government's ability to present its case in court.

    16.    Public disclosure of the third category of records, identified in the First Seidel Declaration in paragraphs 67 through 68, as Public Source/Non-Investigative Harm Materials, does not present any concerns of interference with the pending prosecution of Maxwell. This third category consists of publicly available news reporting and other open source materials that are already accessible online through public sources. Accordingly, I agree with the First Seidel Declaration's conclusion that materials in this third category can be produced in full to Plaintiffs. Consistent with that conclusion, I understand that the documents falling within this category have already been produced to Plaintiffs.

## Segregability

    17.    The records withheld in full under Exemption 7(A) are exempt from disclosure in their entirety under Exemption 7(A). To the extent the records contain any non-

exempt information, such information is inextricably intertwined with information that could reasonably be expected to interfere with the *Maxwell* prosecution for the reasons discussed above. The media coverage of speculation and theories about Maxwell's association with Epstein makes the segregation of any possibly non-exempt information particularly difficult because providing information pertaining to Epstein without complete context can reasonably be expected to contribute to the dissemination of speculation and theories about the *Maxwell* case. This, in turn, could reasonably be expected to interfere with witness testimony and juror impartiality, thus affecting the Government's ability to present its case in court, for the reasons discussed above. Additionally, premature disclosure of any material within the investigative file would either provide Maxwell with greater access to the FBI's files than she is otherwise entitled to (with respect to materials that have not been produced to Maxwell), or contravene the Protective Order entered in the *Maxwell* case (with respect to materials that have been produced to Maxwell, all of which was subject to the Protective Order).

### Exempt Information Within the Documents Withheld Categorically Under Exemption 7(A)

18.     Although the Government is unable to provide a *Vaughn* index with respect to the material withheld categorically under Exemption 7(A) without thereby revealing information protected by the Exemption, such as the volume of withheld materials, much like the documents that are listed on the *Vaughn* index, these documents include information that is properly withheld under additional exemptions, including Exemption 3 (grand jury), Exemption 3 (Child Victims' and Child Witnesses' Rights Act), Exemptions 6 and 7(C) (names and other personal information of government employees and third parties), Exemption 7(D) (provided an under an assurance of confidentiality), and Exemption 7(E)

15

(law enforcement techniques and procedures).

19. For example, the documents the FBI categorically withheld under Exemption 7(A) after Epstein's arrest include records provided by entities in response to grand jury subpoenas ("grand jury returns"), records kept by the court reporter of the grand jury regarding testimony heard by the grand jury, copies of grand jury subpoenas, FBI reports documenting the service of grand jury subpoenas and receipt of subpoena returns, and documents containing the FBI's analysis of records obtained via grand jury subpoena. These records are also being withheld pursuant to Exemption 3 as protected by Federal Rule of Criminal Procedure 6(e) because they tend to reveal what transpired before the grand jury, as described in more detail below:

   a. The grand jury returns include business records—such as financial records, phone records, shipment records, and travel records—produced in response to grand jury subpoenas. These records are identifiable as grand jury materials and would therefore reveal the investigative activities of the grand jury for two reasons. First, many of the business records are accompanied by cover sheets identifying the records as subpoena returns, by copies of the subpoenas requiring the production of the records, by cover letters from the businesses referencing the receipt of a subpoena, and/or by invoices from the subpoenaed companies' subpoena compliance departments, indicating that the records were produced in response to a grand jury subpoena. Second, I know based on my experience conducting criminal investigations that companies such as financial institutions, phone service providers, shipping companies, and travel companies do not ordinarily provide their business records voluntarily to investigators; rather, these companies insist on legal process, typically a subpoena, before providing their confidential business records. Accordingly, the

production of such records from such companies from within the FBI's files could reasonably lead an observer to correctly infer that these records were obtained through grand jury subpoenas, thus revealing details of the grand jury's investigation.

        b.        The court reporter's records regarding the testimony received by the grand jury would reveal what witnesses testified before the grand jury and when. The release of these records would therefore reveal details regarding the confidential investigative activities of the grand jury.

        c.        The copies of grand jury subpoenas provide a roadmap to the grand jury's investigation by revealing what witnesses and/or records the grand jury sought at particular points during the investigation. Release of the grand jury subpoenas would therefore reveal details of the grand jury's investigation.

        d.        FBI reports documenting the service of subpoenas and receipt of subpoena returns similarly provide a roadmap to the grand jury's investigation by revealing what witnesses and/or records the grand jury sought at particular points during the investigation. Release of those reports would therefore reveal details of the grand jury's investigation.

        e.        Documents containing the FBI's analysis of records obtained through grand jury subpoena include timelines and other organizational documents analyzing and organizing business records obtained during the grand jury's investigation, such as phone records. As noted above, the types of business records analyzed in these documents are not ordinarily produced to investigators absent legal process, such that any indication that the FBI came into possession of such records could lead an observer to correctly infer that those records were obtained through grand jury subpoena. Accordingly, the public release of

documents containing analysis of records obtained through grand jury subpoena would tend to reveal details of the grand jury's investigation.

20.     The documents the FBI categorically withheld under Exemption 7(A) after Epstein's arrest also include records relating to child victims and child witnesses that are being withheld pursuant to Exemption 3 as protected by the Child Victims' and Child Witnesses' Rights Act, 18 U.S.C. § 3509.  These records include reports and notes of interviews with child victims and child witnesses, reports and notes of interviews with other witnesses referencing child victims and child witnesses, and background materials revealing the personal and identifying information of child victims and child witnesses (such as medical records, social media records, and school records).  These records would reveal the names, images, and identifying information of child victims and child witnesses within the investigation into Epstein's sexual abuse of minors.

21.     The documents the FBI categorically withheld under Exemption 7(A) after Epstein's arrest also include two categories of records withheld pursuant to Exemption 7(D).

    a.     The first category consists of records relating to adult victims and adult witnesses that are being withheld pursuant to Exemption 7(D) because the witnesses provided information under express grants of confidentiality, as is apparent from the face of the documents, or where confidentiality can be inferred based on the sensitive, personal, and potentially embarrassing topics those witnesses disclosed during interviews with law enforcement.  These records include reports and notes of interviews with adult victims and witnesses, reports and notes of interviews with other witnesses referencing adult victims and witnesses, and background materials revealing the personal and identifying information of adult victims and witnesses (such as criminal history records, social media records, and

school records). These records would reveal the names, images, and identifying information of adult victims and witnesses within the investigation into Epstein's sex trafficking offenses.

        b.      The second category consists of records and information that local law enforcement agencies provided to the FBI, where confidentiality can be inferred. Because those materials were provided to the FBI during a confidential grand jury investigation, it is reasonable to infer that the local law enforcement agencies would expect that information, which includes reports of witness interviews, reports of other investigative steps, and materials gathered by local investigators, would be kept confidential.

    22.    Further, the documents the FBI categorically withheld under Exemption 7(A) after Epstein's arrest include the names and other personal information of government employees and third parties where "the disclosure would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), or where the records were "compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C). With respect to these documents, the individuals' privacy interests outweigh any public interest in disclosure. The information withheld under this category include names and identifying information of third parties of investigative interest; FBI special agents and victim specialists; third party victims; local law enforcement and other local government personnel; third parties merely mentioned; non-FBI federal government personnel; and third parties who provided information. I agree with the weighing of the private and public interests with respect to each of these categories of individuals that is contained in the First Seidel Declaration, paragraphs 73 through 83, and hereby incorporate that rationale by reference.

    23.    Finally, the documents the FBI categorically withheld under Exemption 7(A)

after Epstein's arrest include records, the release of which would disclose non-public techniques or procedures used by the FBI to pursue its law enforcement mission, and non-public details about techniques and procedures, which are withheld pursuant to Exemption 7(E). These records include the following categories of information, as described in more detail in the First Seidel Declaration, paragraphs 98 through 112: the methods the FBI uses to collect and analyze information it obtains for investigative purposes; sensitive investigative file numbers; information about dates/types of investigations; information regarding targets, dates, and scope of surveillance; information contained in FD-515s; database identifiers/printouts; and monetary payments/funding for investigative purposes. As described in more detail in the First Seidel Declaration, paragraphs 98 through 112, release of this information would, among other things, enable criminals to educate themselves about the techniques employed by the FBI to circumvent them.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 7th day of December 2023.

_____
MAURENE COMEY
Assistant United States Attorney
United States Attorney's Office for the
Southern District of New York